**A. G. SPALDING & BROS., INC.,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 13277.

United States Court of Appeals
Third Circuit.

Argued Feb. 21, 1961.

Decided March 22, 1962.

Albert R. Connelly, New York City (John D. Calhoun, Arnold I. Roth, New York City, Cravath, Swaine & Moore, New York City, on the brief), for petitioner.

Alan B. Hobbes, Washington, D. C. (Pgad B. Morehouse, Acting General

Counsel, Jno. W. Carter, Jr., Miles J. Brown, on the brief), for the Federal Trade Commission.

Before KALODNER, STALEY and FORMAN, Circuit Judges.

FORMAN, Circuit Judge.

A. G. Spalding & Bros., Inc. (Spalding) seeks to review and set aside an order of the Federal Trade Commission (Commission) directing it to divest itself of all the capital stock and assets of Rawlings Manufacturing Company (Rawlings) which it acquired in 1955. The order was based upon the Commission's opinion concluding that the acquisition of Rawlings by Spalding violated § 7 of the Clayton Act, as amended, 64 Stat. 1125, 15 U.S.C.A. § 18, which provides in pertinent part as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

PLEADINGS AND PRIOR PROCEEDINGS

The complaint, filed December 8, 1955, before the Federal Trade Commission, charged, among other things, the following allegations: that Spalding is a corporation of Delaware and Rawlings of Missouri; that on or about December 6, 1955, Spalding acquired all of the outstanding capital stock of Rawlings; that Spalding is engaged in the manufacture of athletic goods and the sale and distribution thereof in interstate commerce to "other manufacturers and distributors, sporting goods stores, department stores, mail order houses, golf professionals and others on a national basis"; that it is one of the four largest manufacturers and distributors of athletic goods in the United States, its sales for 1954 amounting to $23,350,000.

It further charged that Rawlings, prior to and at the time of the acquisition, was likewise engaged in the manufacture of athletic goods and the sale and distribution thereof in interstate commerce to "other manufacturers and distributors, sporting goods stores, department stores, mail order houses and others throughout the nation" and that its line is in direct competition with the line distributed and sold by Spalding and that Rawlings is also one of the four largest manufacturers and distributors of athletic goods in the United States, the sales of which during 1954 amounted to $10,500,000.

The complaint also alleged that by the acquisition of the capital stock of Rawlings, Spalding has eliminated one of the four largest competitors in the manufacturing and distribution of its athletic goods line and has acquired Rawlings's manufacturing facilities to make certain athletic goods which Spalding had theretofore been compelled to purchase from Rawlings or some other manufacturer and that the acquisition "may have the effect of substantially lessening competition or tending to create a monopoly" in the manufacture, sale and distribution of athletic goods in violation of Section 7 of the Clayton Act.

In its answer Spalding admitted that it acquired all of the outstanding capital stock of Rawlings on December 8, 1955. It stated that prior to and at the time of the acquisition it manufactured certain athletic goods which it sold largely through its Spalding Sales Corporation which distributed such items nationally together with complementary items manufactured by others and that the total of its sales and those of Spalding Sales Corporation during 1954 amounted to $18,783,639.

Spalding further stated in its answer that Rawlings was likewise engaged in

the manufacture of certain athletic goods which it sold largely to its Rawlings Sporting Goods Company which distributed such items nationally together with complementary items manufactured by others with its total sales and those of Rawlings Sporting Goods Company amounting to $8,282,505 for the year 1954.

Spalding generally denied other allegations contained in the complaints as well as the charge that, by its acquisition of the stock of Rawlings, it violated Section 7 of the Clayton Act.

Jurisdiction of this court is properly invoked pursuant to, and venue is based upon, Section 11 of the Clayton Act, 15 U.S.C.A. § 21, as amended.

Integration of Rawlings's facilities with Spalding's during the pendency of the proceedings has been controlled by a stipulation executed by counsel supporting the complaint before the Commission and counsel for Spalding, whereby Spalding agreed, in substance, to maintain the pre-merger status of Rawlings and to make no changes therein without advance notice to the Commission.

Hearings commenced on April 30, 1956 before a Hearing Examiner and continued intermittently through December 16, 1958. The refusal of two witnesses to produce documents called for by subpoenas duces tecum resulted in the institution of enforcement proceedings terminating favorably to the Commission.[1] Spalding rested without offering evidence and moved for dismissal of the complaint.

Before the Hearing Examiner counsel for the Commission selected 19 products manufactured and sold by both Spalding and Rawlings (including those that are sold by both but not manufactured by both),[2] as "illustrative of the area in which the acquisition of Rawlings will have a substantial economic impact." They were:

| | |
|---|---|
| Golf clubs (irons) | Volley balls |
| Golf clubs (woods) | Footballs |
| Golf balls | Football helmets |
| Baseballs | Football shoulder pads |
| Softballs | Football hip and kidney pads |
| Baseball gloves | Basketballs |
| Basemen's mitts | Tennis balls |
| Catcher's mitts | Tennis racket frames |
| Soccer balls | Strung tennis rackets |

Badminton rackets (frame and strung rackets)

---

Spalding made no substantial objection to the consideration of the list as selected. The Hearing Examiner's findings with respect to the competitive effect of the merger were based primarily on an analysis of the following product

1. Federal Trade Commission v. Tuttle (S.D.N.Y.), opinion unreported, rev'd 244 F.2d 605 (2 Cir.), cert. denied 354 U.S. 925, 77 S.Ct. 1379, 1 L.Ed.2d 1436 (1957); Federal Trade Commission v. Bowman, 149 F.Supp. 624 (N.D.Ill.), aff'd 248 F.2d 456 (7 Cir. 1957).

2. Among the products handled by Spalding and Rawlings both manufactured the following six items: baseballs, softballs, basketballs, footballs, soccer balls and volley balls. Spalding manufactured nine items which Rawlings handled but did not manufacture, namely: tennis balls, golf balls, badminton rackets and frames, tennis rackets and frames, golf clubs (irons and woods), golf bags and golf balls. Rawlings manufactured eleven items which Spalding handled but did not make, namely: baseball mitts, gloves, masks, body protectors, leg guards, football helmets, shoulder pads, hip pads, kidney pads, boxing gloves and striking bags.

lines: baseballs, footballs, softballs, volley balls, soccer balls and baseball gloves and mitts. The Commission likewise confined its consideration to the same product lines.

The Hearing Examiner filed his Initial Decision February 27, 1959, dismissing the complaint on the ground that the evidence failed to establish that the effect of the acquisition of Rawlings by Spalding may be substantially to lessen competition or tend to create a monopoly, in violation of Section 7 of the Clayton Act.[3]

An appeal to the Commission followed. The Commission in effect reversed the Initial Decision by its order and opinion of March 30, 1960. It ordered divestiture and submission of a plan for compliance by Spalding within 60 days.[4]

### THE GENERAL LINE ATHLETIC GOODS COMPANIES

At the time of the acquisition there were four so-called general line companies in the athletic goods industry. A general line company was considered one which sells a variety of products either directly or through subsidiaries. A single line company markets one or possibly a few product lines. In addition to Spalding and Rawlings there were two other general line companies, Wilson Athletic Goods Manufacturing Company, Inc. (Wilson) and MacGregor Sporting Products Inc. (MacGregor).

The total number of firms engaged in the production of athletic goods is approximately 200.

Prior to the acquisition the four general line companies (Wilson, Spalding, MacGregor and Rawlings, in that order) were the principal producers of athletic products in the United States. There were a few companies such as Kennedy Sporting Goods Manufacturing Company, Hutchinson Brothers Leather Co., Dubow Manufacturing Co., Inc., George K. Reach Company and Stall and Dean Manufacturing Company which produced and sold a partial line, but the great majority of the companies are single line companies.

Spalding had its beginning in 1876 when two brothers, Albert G. Spalding and J. Walter Spalding, formed a partnership for the sale of baseball equipment at wholesale and retail. Later a brother in law, William T. Brown, was admitted to the partnership. In 1885 the partnership was incorporated in Illinois under the name of A. G. Spalding & Bros. In 1892 A. G. Spalding & Bros. was incorporated in New Jersey. All of the capital stock of the following corporations was transferred to the New Jersey corporation:

1. A. G. Spalding & Bros., the Illinois corporation;

2. Wright & Ditson, a New Jersey corporation engaged in the manufacture of athletic goods, with emphasis on tennis rackets;

3. A. J. Reach Company, originally a partnership incorporated in about 1885, engaged principally in the manufacture of baseballs and baseball mitts and gloves;

4. George Bernard & Company, a New Jersey corporation engaged in the manufacture of uniforms and knit goods;

5. Spalding Manufacturing Company, an Illinois corporation formed to operate the A. G. Spalding & Bros. baseball-bat factory; and

6. Peck & Snyder, a retail store in New York City dealing in sporting equipment.

It continued its corporate existence without material change until the depression period of the 1930s. In 1934 another reorganization occurred as a

---

3. A. G. Spalding & Bros., Inc., FTC Dkt 6478, Trade Reg.Rep. par. 27,858 (1959).

4. A. G. Spalding & Bros., Inc., FTC Dkt 6478, Trade Reg.Rep. par. 28,694 (1960).

solution to the problem of reduced sales of athletic goods which on a national level had dropped about 60%. In 1939 Spalding was reorganized as a Delaware corporation under its present name of A. G. Spalding & Bros., Inc., with all the assets of the former New Jersey corporation.

In December 1955, at the time of the acquisition, Spalding was engaged in the manufacture and sale of a general line of athletic goods. Its full line consists of more than 1100 different articles, including golf, baseball, football, basketball, volley ball, soccer, tennis, badminton and boxing equipment, athletic clothing and related products. Its main factory and executive offices are in Chicopee, Massachusetts. Through its wholly-owned subsidiary, Spalding Sales Corporation, it distributes its products through wholesale distributing depots and sales offices located in principal cities throughout the United States. At the time of the acquisition its assets amounted to $16,-665,299 and its sales of finished products in 1955 amounted to $23,200,737.

Rawlings was originally founded in 1898 in St. Louis, Missouri, by George H. Rawlings and Charles W. Scudder for the purpose of manufacturing and selling athletic equipment and sporting goods, primarily clothing, at wholesale and retail. At the time of its acquisition by Spalding in 1955 it was a Missouri corporation engaged in the manufacture and sale of a general line of athletic goods, with its main office and principal place of business located at St. Louis, Missouri, Rawlings had three plants in Missouri, one in St. Louis, one in Newburg and one in Licking. It also had a wholly-owned subsidiary, Rawlings Sporting Goods Company, and sales offices and wholesale distribution depots in St. Louis, Chicago, and Los Angeles.

Rawlings was in sound financial condition in December 1955. Total corporate assets had increased by 22% from 1953 to 1955, to approximately $6,500,000. Net sales for 1955 were $11,209,825. Net worth had increased 25% in the same period to approximately $4,288,000. Net

earnings rose from $222,524 in 1953 to $551,824 in 1955. Earnings invested in the business exceeded one million dollars in the three year period and dividends were paid on both preferred and common stock. Twenty percent of the former and 90 percent of the latter was owned by six shareholders. Rawlings distributed its products nationally for many years prior to the acquisition by Spalding.

Spalding acquired Rawlings's capital stock for approximately $5,698,000. Rawlings Manufacturing Company was dissolved immediately thereafter. Spalding continued its business as the Rawlings Division of Spalding using the name Rawlings Manufacturing Company. Among the assets taken over by Spalding was the stock of Rawlings Sporting Goods Company, the wholly-owned subsidiary of Rawlings, which was the sales company for merchandise bearing the Rawlings trademark. It remains in existence competing with Spalding Sales Corporation for the same customers.

Another of the general line companies, Wilson, was organized in 1910 as the Ashland Manufacturing Company, a subsidiary of Wilson and Company, the Chicago meat packing firm. It underwent a number of name changes, emerging in 1941 in its present form and with a wholly-owned sales subsidiary, Wilson Sporting Goods Company. In the course of some four decades Wilson acquired at least seven smaller firms and in 1955 operated 13 manufacturing plants in various parts of the country. Wilson sells a general line of athletic goods, either manufactured by it or purchased from other manufacturers for resale through its 29 branches in 28 states and has been recognized for a number of years as the leading producer of athletic goods in the industry.

MacGregor, the other leading general line competitor of Spalding and Rawlings at the time of the 1955 acquisition, was founded in 1875 as a partnership, incorporated in 1922. In 1958, 98% of MacGregor's outstanding stock was acquired by Brunswick-Balke-Collender

Company. Between 1875 and 1958 Mac-Gregor acquired at least five other small producers and in 1955 it was recognized as the third-largest in the industry in point of sales.

### THE ATHLETIC GOODS MANUFACTURING ASSOCIATION

Prior to 1925 manufacturers of athletic goods organized a trade association known as the Athletic Goods Manufacturing Association (AGMA). Its purposes are listed in Article II of its constitution and by-laws to be:

> " * * * the protection and advancement of the athletic goods industry, the promotion and encouragement of athletic activities, the exchange of credit information, the development of adequate cost systems, the standardization of trade description and the simplification of lines, the development, promotion and enforcement of a code of trade practices."

At the time of the acquisition about 25 firms were members including the principal companies engaged in the industry.

From 1949 to 1954 AGMA engaged in gathering and publishing statistics of the industry's production. At first this was to aid industry members in obtaining raw material allocations in times of national emergency. After such commodities became plentiful the information was deemed valuable to the members of the industry and therefore the practice was continued. Beginning in 1949 questionnaires were prepared and sent to all known manufacturers of athletic products requesting that they report their annual sales of some 43 specified items on both a quantity and dollar basis. The inquiry requested production figures broken down into specific price categories. For example, the 1955 questionnaire called for information on production of

baseballs on the basis of prices charged to dealers in the following classifications:

> "Over $16.00 per dozen
> $9.01 to $16.00 per dozen
> Up to $9.00 per dozen
> Molded or Rubber Covered Baseballs."

Information according to price categories for other products such as softballs, footballs, and boxing gloves was similarly solicited. A compilation of the individual reports showing total annual production of each item was prepared by an accounting firm and was known as "AGMA's Census Reports" or "Census Surveys." [4a]

In 1954, 74 of 184 firms to whom the questionnaire was sent responded. In 1955, 75 out of 197 firms participated.

During the years 1953–1958, one or more of the four companies, Spalding, Rawlings, Wilson and MacGregor were represented in the officer complement of AGMA.

### THE ISSUES

Spalding raises two issues by this review:

(1) Whether there is substantial evidence to support the Commission's findings that the relevant lines of commerce are (a) the athletic goods industry and (b) higher- and low-priced categories within particular product lines; and

(2) Whether there is substantial evidence to support the Commission's findings that the acquisition of Rawlings by Spalding may substantially lessen competition or tend to create a monopoly.

### PRICE CATEGORIES AS RELEVANT LINES OF COMMERCE

At the outset, we are confronted with the task of considering whether the Commission properly determined the relevant lines of commerce in this case.

---

4a. The reports were considered confidential. In 1954 the data was prepared and tabulated in the "AGMA Census Report" by Ernst & Ernst, an independent accounting firm. In 1955 the data was prepared by that firm but tabulated by the Accounting Division of the Federal Trade Commission.

It was argued before the Commission that the AGMA Census Report price categories were designed by the manufacturers themselves, through the AGMA Census Report Committee, to define differing physical characteristics, markets, prices and end uses for all of the products for which categories were established. To support the position that the products in each of the price categories are sufficiently different and distinct from those in any other price category within the same product line to constitute each group of products so classified a separate line of commerce for this proceeding, counsel supporting the complaint called as witnesses, George J. Herrmann, Executive Secretary of AGMA, Fred J. Bowman, President of Wilson and Philip H. Goldsmith, Chairman of the Board of MacGregor. Messrs. Bowman and Goldsmith had been officers of AGMA and members of its Census Report Committee.

Mr. Herrmann testified that the price categories into which the inquiries in AGMA's questionnaire were divided were designed "to particularly find out the market for various types of the equipment, the volume that would be in various price classifications." [5] In response to the following questions, by counsel supporting the complaint, he further testified:

"Q. Was that also designed to separate any particular classes or products as to quality?

"A. Well, the price would govern whether it was the better quality or whether it might have been in the toy classification, or whether it would be high quality equipment.

"Q. Do you mean by that that the toy classification would be the lower priced equipment?

"A. That's right."

Mr. Bowman testified in reply to a question on direct examination in which he was asked "about the significance of the price categories, * * * shown in the AGMA Survey", that the price schedule was used instead of specifications to designate the quality of raw materials that went into the product as well as the workmanship. He was then asked, "So that as I understand your answer the price categories are related to the quality of the product sold?" He answered "That is right." Mr. Bowman further testified as to Wilson's American Player line:

"That is what we call the low end. That is not the quality that went in there. That is, they were cheaper materials and less labor would go into that type of merchandise than would go in your better grades."

He also characterized the American Player line:

" * * * as the juvenile line of equipment sold for Christmas selling, including lower priced footballs, basketballs, shoulder pads, basketball goals, bat and ball sets, youth boxing gloves and striking bags, equipment of that type sold mostly to the toy departments."

In response to further questions Mr. Bowman replied:

"Q. Mr. Bowman, with respect to the items set forth in the American Player catalog, Commission's Exhibit 50-A, do I understand you correctly to say these items represent something in the nature of toys?

"A. Well, it is not exactly a toy. It goes to the younger children who are not old enough, you may say, to

---

5. The AGMA Census Reports divide the product "baseballs" into three price groups and one additional class:

| | *1954* | *1955* |
|---|---|---|
| 1. | Over $16.75 per dozen | Over $16.00 per dozen |
| 2. | $9.01 to $16.75 per dozen | $9.01 to $16.00 per dozen |
| 3. | Up to $9.00 per dozen | Up to $9.00 per dozen |
| 4. | Molded or rubber-covered baseballs | Molded or rubber-covered baseballs. |

participate in the games and use regular equipment. It is more or less a juvenile line.

"Q. It is a juvenile line and would not be used in professional leagues and by colleges and universities?

"A. That's right."

Mr. Goldsmith gave the following testimony on the subject of price categories:

"Q. Now, Mr. Goldsmith, I call your attention to price category shown on the A. G. M. A. census reports and ask you to state the significance of the price categories on certain product classifications.

"A. The industry as a whole felt that it was necessary to break it down for quality's sake and you cannot take every item that is made in the athletic goods industry and examine it to find out what category it goes in so that the best thing you can do is by price route. Probably the best illustration I can give would be that of baseballs.

"Q. That is shown on page 4 of CX-70.[6]

"A. For example, we have baseballs broken down into three price categories. Baseballs up to $9.00 a dozen is Category 1. $9.00 a dozen was just picked out at random because it was a known fact that it would be necessary, that any ball sold for under $9.00 a dozen couldn't be a yarn-wound ball. Nobody in this country could make one for less than $9.00 and have it to be a serviceable ball. So when we look at that figure there we know that there were in that particular year over 5,000 dozen baseballs sold that were not of a yarn-wound construction, that were of an inferior nature that would not be used in league games or in regular competition games.

"Then the next category was from $9.01 to $16.80. That took in all the playable balls that the kids would use, the amateurs, the small leagues, and so forth, up to that price bracket, and we did know from experience that no one could turn out the top ball for less than $16.80 so therefore $16.80 in that particular year anything that was sold, some manufacturers might sell their top ball at $16.80, others at $18.00, others at $19.00, others at $20.00. Anything above that we knew was the official top ball. So that gave the manufacturers then three categories through the route of the price but indicates the quality."

Spalding attacks the qualifications of Mr. Herrmann to testify as to the classifications of the products on the ground that his services to AGMA were clerical and administrative. His testimony that certain items covered by the reports were "toys" was said to be entitled to little

---

6. Commission's Exhibit 70, a copy of MacGregor's 1950 AGMA Census Report, shown to the witness, sets forth the following data with respect to MacGregor's sales of baseball products:

| "Baseballs | Unit of Measure | Quantity | Value F.O.B. Plant (omit cents) |
|---|---|---|---|
| Up to $9.00 | Dozen | 5,199 | 38,162. |
| $9.01 to 16.80 | Dozen | 23,699 | 340,180. |
| Over $16.80 | Dozen | 43,714 | 1,162,184. |
| Total | Dozen | 72,612 | 1,540,526. |
| Average Value | XXXX | XXXX | $21.22 |
| Molded or Rubber Covered Baseballs | Dozen | 2,258 | 11,824. |
| Average Value | XXXX | XXXX | $ 5.24 |
| Total all Baseballs | Dozen | 74.870 | 1,552,350. |
| Average Value | XXXX | XXXX | 20.73" |

or no weight and that whatever weight might be given to it was destroyed by his denial that he knew which AGMA price categories were meant to embrace toys.[7] Further Spalding alleges that Mr. Herrmann's testimony as to the aspect of toys was uncorroborated and that in any event Mr. Herrmann merely meant by his reference to "toys" items not of official size and weight.

Mr. Herrmann was Treasurer of AGMA from 1949 until he became Executive Secretary in 1953 and his duties, among other things, consisted of handling the statistical data which it was the object of AGMA to collect and distribute. In this regard, it is true, Mr. Herrmann acted in an administrative capacity but his testimony concerning the mechanics of AGMA's operations was quite within his qualifications. He testified that AGMA categories defined certain products as toys, but he was not able to designate at what point the classification operated in this manner. Mr. Herrmann's idea of the word "toys" may not have been precisely descriptive of the lower priced category of athletic goods. It is to be noted that Mr. Bowman testified in describing Wilson's "American Player line", a less expensive line of products produced and sold by Wilson, as being items that were "sold mostly to the toy departments."

On the whole Mr. Herrmann's statements were consistent with the general intent of the AGMA classifications as expressed by Messrs. Goldsmith and Bowman. Taken together the testimony of the three witnesses formed a substantial foundation for the findings of the Commission that:

"We think it clear from this testimony that in each of the various product lines for which AGMA price categories were established there is a separate line of low priced items which is not sold in competition with other items in the same product line. These low priced items may properly be classified as toys or as products not suitable for use in organized competitive games. Other items within the same product line are of higher quality, more durable and are designed for use in regular competition by both professional and amateur teams and players. The products in each of these categories are physically distinct from those in the other; they are different in quality and price, as well as in the purpose for which they are made and used. There can be no doubt that these two categories within the various product lines can be distinguished competitively from each other and that they constitute separate and distinct lines of commerce within the meaning of Section 7.

"Using baseballs as an example, the uncontradicted testimony of the witness Goldsmith establishes that there are sufficient differences between baseballs selling for under $9.00 a dozen and those selling for more than $9.00 a dozen to constitute them separate lines of commerce. One is yarn-wound; the other is not. One is suitable for use in organized competitive play; the other is not. They are of different quality, are sold at different prices, and have different end-uses and different markets. The market for the higher priced baseballs consists of major and minor league teams, semi-

---

7. On cross examination Mr. Herrmann testified as follows:

"Q. Would you point out * * * the price classification or price classifications to which you refer when you say that those were the ones that were designed to exclude toys?

"A. No, I can't do that. I don't know * * * I can look them over, but I can't tell you because I don't know the classifications, the price classifications that would be considered as toys.

"Q. * * * Is there * * * any price classification whatever that you can identify as being designed to exclude toys from other playing equipment?

"A. I can't identify them * * * No, I can't. The manufacturer can, I can't."

professional and amateur teams, colleges and high schools, and all others who use baseballs in organized games. The low priced baseballs are not suitable for use by customers who make up this market and for that reason cannot be considered to be competitive with the higher priced baseballs.

"Counsel supporting the complaint contends that there are three separate lines of commerce within the baseball product line. The first or low priced line, includes baseballs selling for under $9.00 a dozen. The second, or medium priced line, includes baseballs in the $9.01 to $16.80 category. This line consists of baseballs used primarily by juveniles in organized competition. The third, or high priced line, includes baseballs selling for more than $16.80 a dozen. This line is used primarily by professional leagues, colleges, and others who require a top quality baseball.

"He has also proposed similar lines for other products, such as footballs, basketballs and boxing gloves. While we agree that the record supports his contention that there are separate and distinct markets for low, medium and high priced items within each of several product lines, we are of the opinion that for the purposes of this proceeding it will be necessary to consider only the lower priced and higher priced lines as indicated above."

Spalding further takes exception to the reference by the Commission to "toys" in its definition of a line of commerce in "low priced items". The Commission used the term in its opinion saying: "These low priced items may be properly classified as toys or as products not suitable for use in organized competitive games." The characterization of "toys" is in the disjunctive along with "products not suitable for use in organized competitive games." Whether or not the lower priced items are actually "toys" is

of little importance. The conclusion of the Commission as to the separate categories of higher-priced and lower-priced athletic goods was well within its province under the evidence before it.

In its recognition of price categories as relevant lines of commerce the Commission differed with the Initial Examiner. It held that he "failed to recognize that there are separate and distinct markets for different lines of products within each of these product lines."

It also found that the Examiner

" * * * compounded this error by emphasizing the number of items produced rather than the value of such items in comparing the competive positions of Spalding and Rawlings with other manufacturers in the industry. As a result, his comparisons, in many instances do not reflect the true competitive relationship existing among these companies."

The Hearing Examiner devised the following table showing the market shares of all manufacturers who participated in the 1954–1955 AGMA Census Survey based on the data relating to the *number* of baseballs produced:

| | 1954 | 1955 |
|---|---|---|
| Lannom | 18.8% | 19.2% |
| Spalding | 16.5% | 15.3% |
| de Beer | 16.2% | 17.9% |
| Wilson | 16.1% | 17.5% |
| MacGregor | 10.9% | 10.2% |
| Rawlings | 10.5% | 9.4% |
| Tober | 3.9% | 4.8% |
| Hofran | 3.8% | 3.1% |
| Sealand | 1.7% | 1.4% |
| Harwood | 1.5% | 1.2% |
| Kennedy | Less than 1% | Less than 1% |

From this he concluded that in 1955 Spalding with its 15.3% was surpassed in production of the number of baseballs by Lannom with 19.2%, de Beer with 17.9% and Wilson with 17.5%. He further found that the combined production quantitatively of Spalding and Rawlings

would be but 24.7% against the next largest producer, Lannom with 19.2%.

The Commission regarded this quantitative analysis as inadequate since, as it stated, it ignored completely the value of the baseballs produced by the same companies which reported to AGMA. It formulated the following table of market shares based on the *value* of all baseballs produced:

| | 1954 | 1955 |
|---|---|---|
| Wilson | 21.3% | 22.9% |
| Spalding | 22.7% | 21.8% |
| MacGregor | 14.0% | 13.8% |
| de Beer | 10.6% | 11.6% |
| Rawlings | 13.0% | 11.3% |
| Lannom | 10.4% | 10.7% |
| Tober | 2.1% | 2.6% |
| Hofran | 2.6% | 2.2% |
| Harwood | 1.8% | 1.6% |
| Sealand | 1.4% | 1.4% |
| Kennedy | .1% | |

On this value basis in 1955 Spalding's share of the market was 21.8% surpassed only by Wilson with 22.9%, while de Beer and Lannom (leaders on a quantitative basis) produced 11.6% and 10.7% respectively. The combined share of Spalding and Rawlings gave it first position of 33.1%.

The contrast between market shares on a quantitative basis and those on a value basis was influenced by the fact that a large portion of the baseballs produced by Lannom and de Beer were in the low-priced category while those produced by Spalding and Rawlings were overwhelmingly in the higher-priced category. The following table, derived by counsel for the Commission from AGMA reports for 1955,[8] reveals, by quantity and value, the production of higher priced and low priced baseballs by the reporting manufacturers.

### HIGHER-PRICED BASEBALLS

| | Over $16.00 | | $9.01 to $16.00 | |
|---|---|---|---|---|
| | Quantity (dozens) | Value | Quantity (dozens) | Value |
| Spalding | 47,376 | $ 945,602 | 42,552 | $ 565,915 |
| Wilson | 38,761 | 751,513 | 58,230 | 780,812 |
| MacGregor | 25,707 | 529,558 | 29,224 | 388,322 |
| Rawlings | 17,148 | 313,993 | 39,865 | 479,969 |
| de Beer | 6,963 | 112,801 | 24,890 | 289,879 |
| Lannom | 5,733 | 97,632 | 18,888 | 211,755 |
| Harwood | 2,850 | 53,400 | 4,870 | 57,760 |
| Sealand | 344 | 6,142 | 7,468 | 85,625 |
| Tober | 202 | 2,272 | 2,569 | 30,768 |
| Kennedy | 67 | 1,133 | 45 | 641 |
| Hofran | —— | —— | —— | —— |
| Totals | 145,151 | $2,814,046 | 228,601 | $2,891,446 |

8. Commission's Exhibit 353G.

LOW-PRICED BASEBALLS

| | Up to $9.00 | | Molded or rubber covered baseballs | |
| | Quantity (dozens) | Value | Quantity (dozens) | Value |
|---|---|---|---|---|
| Spalding | 12,121 | $ 88,059 | 3,344 | $ 21,682 |
| Wilson | 23,424 | 166,075 | —— | —— |
| MacGregor | 13,023 | 94,083 | 2,414 | 14,765 |
| Rawlings | 7,641 | 47,066 | —— | —— |
| de Beer | 67,075 | 410,824 | 24,735 | 54,136 |
| Lannom | 101,883 | 470,818 | 5,920 | 12,011 |
| Harwood | 800 | 5,540 | —— | —— |
| Sealand | 1,851 | 14,485 | —— | —— |
| Tober | 30,279 | 158,116 | —— | —— |
| Kennedy | —— | —— | | |
| Hofran | —— | —— | 21,087 | 162,754 |
| Totals | 258,097 | $1,455,066 | 57,500 | $265,348 |

The foregoing figures disclosed that in 1955 out of a total of higher-priced baseballs (over $9.01 per dozen) of 373,752 dozens and $5,705,492 in value, the four general line companies, Spalding, Wilson, MacGregor and Rawlings produced in the aggregate 298,863 dozens and $4,755,784 in value. Out of 315,597 dozens and $1,720,914 in value of the low-priced baseballs (up to $9.00 per dozen and molded or rubber-covered baseballs) Spalding, Wilson, MacGregor and Rawlings, together, produced 61,967 dozens and $430,730 in value, while the other companies produced 253,630 dozens and $1,289,684 in value, including Lannom and de Beer who together produced 199,611 dozens of $947,789 in value.

It is apparent then that Spalding and Rawlings were substantial competitive factors in the higher priced baseball area but that their respective production figures in the low priced area were significantly smaller. On the other hand, in the low priced baseball areas de Beer and Lannom were the production leaders. The two price categories represent areas which were separately dominated by different production leaders, the higher-priced—by Wilson, Spalding, MacGregor and Rawlings, and the low priced—by de Beer and Lannom.

The record contains similar statistical data for other product lines, viz., basketballs, footballs, and softballs. Hence the Commission correctly concluded:

"One of the most significant points in the entire record is that Spalding and Rawlings were engaged primarily in the production and sale of athletic goods in the higher priced, higher quality line. It is, therefore, within this higher quality line of the various product lines that an appraisal of the competitive effect of the merger should properly be made. The manufacture and sale of the low priced line of athletic products involves an entirely different market and may be completely disregarded in making this appraisal."

Spalding challenges the Commission's holding that price categories are relevant lines of commerce, contending that the only relevant lines are individual product lines, viz., baseballs, softballs, etc., and that these may not be "fragmented into a myriad of separate lines based on price categories of the AGMA reports." Urging that AGMA price categories are not relevant lines of commerce because they do not meet the tests defining areas of effective competition and that their

use would destroy the line of commerce concept as an analytical device for probing the competitive effects of the Rawlings acquisition, Spalding submits that the Hearing Examiner was correct, and the Commission wrong, in reversing the finding that only undivided product lines can be considered areas of competition and therefore relevant lines of commerce.

Spalding contends that the AGMA price categories have no meaning in the terms construed by the Commission as a "market" for "low priced items" consisting of "toys" and products not suitable for use in organized competitive games and a "market" for higher priced items which are designed for use in regular competition by both professional and amateur teams and players. It argues that " 'low priced items' throughout the various product lines that are clearly 'designed for use in regular competition' while conversely there are higher priced items which are 'not suitable for use in organized competitive games.' " It calls up three instances of such nature:

(1) Baseball gloves for use in regular Little League competition at $36.00 per dozen, within the lowest AGMA category for baseball gloves;

(2) "Junior Size" leather footballs at $70.20 per dozen, within AGMA's higher priced category ("leather and rubber-covered selling for more than $45.00 per dozen") which are not playable, and

(3) "Smaller than regulation" rubber-covered basketballs at $50.40 per dozen, within AGMA's higher priced category (more than $48.00 per dozen) likewise not playable.

However, it should be observed that the citation of a few examples [9] of variations from the general pattern hardly constitutes a persuasive argument that the Commission erred in interpreting AGMA price classifications as defining the higher priced categories as lines of commerce. A review of the entire record reveals that there was substantial evidence to support the Commission's finding that higher priced and low priced categories "can be distinguished competitively from each other and that they constitute separate and distinct lines of commerce." In general, the former is suitable for use in organized competitive play; the latter is not. As the Commission noted, "[t]hey are of different quality, are sold at different prices, and have different end-uses and different markets." [10] Further, Spalding submits that the bulk of all items sold by Spalding and Rawlings regardless of price, is distributed through the same channels—sporting goods dealers (except for some golf equipment that Spalding sells through golf professionals)—and is available to the same ultimate customers. Thus, Spalding argues, that a product line such as baseballs is available to buyers "in a continuum of gradually ascending prices and qualities which cannot be broken at any point without grossly distorting the competitive relationships between baseballs above and basketballs below the breaking point." Spalding claims that the close competitive relationship between items of differing prices is seen from the offering of them side by side in the same store to the same prospective buyers and that the promotion of a particular item is always

9. Mention is also made of Rawlings "BJB" basketballs of junior size and weight at $56.40 per dozen and Wilson's smaller than regulation size "Junior Official League" baseballs at $14.50 per dozen, both unplayable products but in the higher priced categories.

10. The marginal nature of Spalding's exceptions is illustrated by its reference to baseball gloves for use in Little League

competition. Although Spalding refers to these items as selling for $36.00 per dozen, "a price clearly within the lowest AGMA category", for baseball gloves, it is to be observed that the lowest AGMA category was precisely "$36.00 or less per dozen." The Junior size leather footballs and smaller than regulation rubber covered basketballs at higher prices are apparently isolated exceptions to the general pattern.

designed to further the general sales effort of all items within the product line.

However, more than mere price is involved in the AGMA categories. The record reveals that they represent meaningful quality differences between items in the same product line. They are adjusted from time to time to preserve their integrity. Regardless of the nature of the pricing and promotional techniques in which Spalding engaged in a given product line, items therein nevertheless still fell into areas of use denoted by AGMA price categories. Those in the higher priced classification were designed for organized competitive games and were not in the same line of commerce as the low priced items.

Spalding also argues that each product line is a competitive unity which has no meaning in terms of any one of its fragments. It asserts that price categories themselves are subject to change and that the Commission ignored the generally accepted economic concept that a manufacturer "is inhibited from raising the price of a higher priced item * * * because a price rise will cause many buyers of that article to shift to a lower priced item * * *." It contends that price change decisions have "repercussions across the various AGMA price categories for a given product line", that by 1955 yarn wound baseballs of regulation size and weight were produced to sell for under $9.00 per dozen and that a top grade baseball could be offered for $16.00 per dozen as compared to $16.80 in 1950 and $16.75 in 1951. Spalding also asserts that it is inevitable when technological improvements and other factors result in changes in product costs,

the reflection of those changes are not limited to any one AGMA price category and that all of these considerations prohibit the fragmentation of the relevant market on the basis of mere price distinctions. It submits, as an example, that the ability to produce higher quality baseballs (i. e., yarn wound) at a lower cost permits those baseballs to be sold at prices formerly applicable only to lower quality baseballs and that the price reduction requires that lower quality baseballs be reduced in price or raised in quality if they are to remain competitive, creating a phenomenom, known as "price sensitivity and cross elasticity of demand" a characteristic which prohibits fragmentation of the relevant market on the basis of mere price distinctions.[11]

Spalding's illustrations of advances made by 1955 in "yarn-wound baseballs of regulation size and weight for under $9 a dozen" are:

(1) Rawlings' "MM1" which it states to be "of 'full regulation size' and with 'yarn wound core' for $8 per dozen," and

(2) Spalding's " 'Official', 'yarn wound' baseballs (Nos. 175 and 176) for up to $9 * * *" a dozen.

The catalogue shows Rawlings' MM1 baseball to be "A durable ball, full regulation size * * * gum yarn wound core of resilient materials." The significance of gum wound is unexplained. The only other gum wound Rawlings' baseball is catalogued as R8 "a semi-hard juvenile ball" selling at $2.85 a dozen.

Spalding's No. 176 is catalogued as "yarn wound" at $9.00 per dozen and its No. 175 is similarly "yarn wound" at $7.20 per dozen. But it is noteworthy that both of these balls are *rubber-*

11. Spalding suggests in this connection that shifts in AGMA price categories, by themselves, cannot define lines of commerce. Using as an example, footballs, it states that in 1954 the highest AGMA price category for rubber footballs was $42.01 and up" and in 1955 was "$45.01 and up." It asks into which of the Commission's so-called lines of commerce its footballs priced both in 1954 and 1955 at $43.20 fell; whether they fell into the same line in 1954 and 1955 and if so

which one, and if not, what justification, —from the standpoint of competitive conditions in the market place—is there for shifting them from one line to another from year to year. Again Spalding has cited an isolated instance of a single item overlapping two years without change in price. It presents an inconsistency but not of the proportion that clouds the justification of the Commission in its determination that there was in this case a line of commerce encompassing higher

*covered.* All of these balls are apparently distinguishable from those in the category found by the Commission to be used for organized competitive play.

At all times the basic question must be kept in sight, i. e., the correctness of the determination by the Commission that the AGMA price categories define relevant lines of commerce within the product lines. Spalding's arguments give emphasis to a few marginal instances in which price classifications are so close that there may be some interchangeability and price sensitivity between items for use in organized competitive games and those that are not. Neither the price change decisions, as cited by Spalding, whether due to technological improvements or otherwise nor the occasional closeness of prices between items in the product lines are shown in such measure as to dilute the substantiality of the evidence before the Commission upon which it based its determination. The reasonableness of its conclusion, derived therefrom that the price categories effectively differentiate playable and nonplayable items, must be held to withstand Spalding's attack in this respect.

Spalding also contends that since marketing data, such as trademarks, trade names, patents and endorsements by athletes, appear on products in all price ranges, they have no understandable meaning with regard to any one AGMA price category but must be viewed in the context of each product line as a whole. This argument also fails to derogate from the effect of the AGMA higher price categories in denoting products used in organized competitive games as defining a line of commerce.

In challenging the Commission's finding that price categories are relevant lines of commerce, Spalding cites four cases: American Crystal Sugar Co. v. Cuban-American Sugar Co., 259 F.2d 524 (2 Cir. 1958); United States v. E. I. DuPont De Nemours & Co., 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957) (duPont-General Motors); United States

v. Brown Shoe Co., 179 F.Supp. 721 (E.D.Mo.1959);[12] United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y.1960).

Spalding cites the Sugar case as a rejection of "the contention that price differentials required a finding of separate lines of commerce." There the court held that beet sugar and cane sugar were a single line of commerce although cane sold at 20 cents more per cwt. than beet and although certain users preferred cane. That case, however, is clearly distinguishable from the one at hand, for there the court found that the price difference between beet and cane was for the most part historical rather than reflective of the actual differences in characteristics and it relied on the overriding consideration that there was "substantially complete functional interchangeability" between beet and cane sugar. That cannot be said of higher-priced baseballs suitable for use in organized competitive play and lower-priced ones unacceptable for such use.

Spalding cites the duPont-General Motors case as demonstrating "the proper handling of price differences in determining relevant lines of commerce," in that it "refused to proliferate automotive fabrics and finishes into a multitude of lines of commerce based upon quality and price distinctions in various types of such fabrics and finishes * * *" However, in that case the Supreme Court found that the market for automotive finishes and fabrics rather than the market for finishes and fabrics generally was the relevant line of commerce. It based its conclusion on the finding that automotive finishes and fabrics have sufficient peculiar characteristics and uses to constitute them products distinct from all other finishes and fabrics and therefore a separate line of commerce within the meaning of Section 7 of the Act. The factor of price was irrelevant in the determination. The Commission's finding in this case that higher priced products within product lines are market areas

12. Appeal to United States Supreme Court argued December 6, 1961, see 30 L.W. 3180.

distinct from low priced items in the same product line is not in conflict with the duPont-General Motors decision. Higher priced athletic products differ from the lower in that they are distinct, physically, in quality, in price and in purpose for which they are made and sold. Higher priced baseballs are not interchangeable with those in the low priced category; each has its own peculiar characteristics and uses.

Spalding cited Brown Shoe as repudiating "the argument for price category lines of commerce here advanced by the Commission." In that case, the court held that men's shoes, women's shoes, and children's shoes constituted lines of commerce, and rejected the argument that "differences in grades, qualities, prices and uses of shoes should be considered in determining the relevant 'line of commerce'." It found a significant "degree of interchangeability" in the shoe industry. For example, the court found interchangeability in the shoe manufacturing process, in price, style and quality of shoes, in the use to which shoes are put by customers and finally that "the shoe people themselves admit that their trade classifications * * * and * * * characterizations * * * to differentiate * * * to catch the buying eye, do not determine the use to which the shoe is put or by whom it [is] put."

In the athletic goods industry, however, the Commission found no such interchangeability between low priced and higher priced categories. It found that the AGMA price delineations mark divisions between non-interchangeable products constituting distinct areas of effective competition. The fact pattern surrounding higher and lower priced men's shoes in Brown Shoe is readily distinguishable from that around the higher priced and low priced categories of athletic goods in this case.

Finally Spalding cites Columbia Pictures asserting that the court there "would not fragment the relevant lines of commerce (television programming) into separate so-called lines of commerce

by reference to quality-derived price distinctions." In that case the court declined to find that "feature films"—i. e., those films originally produced for theatre viewing and later released for television showing—constituted a line of commerce or product market distinct from other types of television programming material including syndicated films produced specifically for television, live programming video taped shows, cartoons and shorts. The court held:

"To determine whether or not there is a reasonable probability of a substantial lessening of competition, Section 7 of the Clayton Act demands an examination into economic realities. All competition must be considered, including competition faced by the product in question from other products." 189 F.Supp. at p. 183.

It concluded:

"In sum, the evidence establishes that feature films face a high degree of competition from other forms of television programming material; that they do not have peculiar characteristics or uses that are significant for television purposes; and that they are reasonably interchangeable with, and compete against, all other types of television programming material. The Court's conclusion is that there is no line of commerce or product market limited to feature films alone." 189 F.Supp. at pp. 191–192.

This case is distinguishable for here the Commission examined the economic realities of the athletic goods industry and found that the evidence established that "in each of the various product lines for which AGMA price categories were established there is a separate line of low priced items which is not sold in competition with other items in the same product line." It found that the "manufacture and sale of the low price line of athletic products involves an entirely different market" from "the production and

sale of athletic goods in the higher priced, higher quality line," and that the "products in each of these categories are physically distinct from those in the other; they are different in quality and price, as well as in the purpose for which they are made and used;" and that "these two categories within the various product lines can be distinguished competitively from each other."

Direction for the determination of the relevant market was given by the Commission, itself, in Brillo Manufacturing Co., FTC Dkt. 6557 (1958), CCH Trade Reg.Rep., Par. 27,243, as follows:

" * * * We think the hearing examiner in concluding as a matter of law that industrial steel wool was the relevant market erred in basing his determinations solely on the fact that those were the wares being produced by the acquired and acquiring companies. The test instead is whether these products are shown by the facts to have such peculiar characteristics and uses as to constitute them sufficiently distinct from others to make them a 'line of commerce' within the meaning of the Act. United States v. E. I. duPont de Nemours & Co. [1957 Trade Cases Par. 68,723], 353 U.S. 586 [77 S.Ct. 872, 1 L.Ed.2d 1057] (1957). That the acquired and acquiring corporations both made industrial steel wool was only one circumstance to be considered. Additional factors which could have been taken into account include data relating to the manner in which the products are marketed, their physical characteristics, prices, and possibly other things bearing on the question of whether or not they may be distinguished competitively from other wares. On the other hand, as the examiner in essence held, the mere fact that articles other than steel wool are marketed for industrial use as abrasives is not adequate legal warrant for including all abrasive products in the relevant line of commerce. The

determinations as to the area of effective competition should have been made on the basis of all record facts delineating the relevant market or markets. * * * "

The Commission in this case faithfully followed this earlier observation.

The Commission arrived at its determination that the AGMA higher priced baseballs (and other products) constituted lines of commerce based on something more than a mere consideration that both Spalding and Rawlings manufactured the same products. Rather, the Commission was influenced by the testimony of witnesses that those price categories delineated products with peculiar characteristics and uses as described in duPont-General Motors. Those peculiar characteristics and uses were found to be in the superior raw materials and labor with which those products were constructed as distinguished from the low priced ones; in their particular suitability for use in organized competitive games and in that they were not interchangeable with lower priced items for the purposes of their purchasers in the market. The Commission found that these higher priced products constituted a distinct area of effective competition.

Segments of product lines have been held to be relevant market areas or lines of commerce in a number of cases.

In Reynolds Metals Co., FTC Dkt. 7009, CCH Trade Reg.Rep. par. 28,533 (1959) the Commission held that "decorative aluminum foil for florists" is a separate line of commerce from "aluminum foil generally" because of different physical characteristics in use, marketing characteristics, price behavior and other factors.

In United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958) the court refused to find that "pipe" constituted a line of commerce, but found that buttweld pipe, electric-weld pipe and seamless pipe each were distinct lines of commerce, on the basis of the peculiar characteristics and uses standards.

In Crown Zellerbach Corp. v. Federal Trade Commission, FTC Dkt. 6180, 54 FTC 769 (1957), affirmed 296 F.2d 800 (9 Cir. 1961), census coarse papers were held to be lines of commerce as distinguished from other census papers.

In International Boxing Club of New York v. United States, 358 U.S. 242, 249, 79 S.Ct. 245, 3 L.Ed.2d 270 (1959), a Sherman Act case, the Court sustained the finding that the relevant market was the promotion of championship boxing contests in contrast to all professional boxing contests.

■ The Commission correctly found that AGMA price categories within product lines constitute separate and distinct lines of commerce and that the higher priced categories were the relevant lines of commerce for the purpose of appraising the competitive effect of the acquisition in this case.

THE ATHLETIC GOODS INDUSTRY AS A RELEVANT LINE OF COMMERCE

The Commission also found "that the industry itself is a relevant market within which to measure the impact of the merger", stating:

"Counsel supporting the complaint also contends that the athletic goods industry as a whole constitutes a line of commerce within the meaning of Section 7 of the Clayton Act. We believe the record fully supports this contention. The testimony of AGMA officials establishes that the principal products of this industry are those listed in the AGMA Census Reports. These products are manufactured and sold by Spalding and formerly had been manufactured and sold by Rawlings. They are products which are required to be used in established and well recognized athletic games. They have peculiar characteristics and end-uses for which there are no substitutes; they are distinct from the products of other industries; and are sold in a recognized market with its own competitive standards. See United States v. Bethlehem Steel Corporation [D.C.], 168 F.Supp. 576 (1958). Moreover the athletic goods industry is recognized by its members and by its trade association as a separate and distinct industry. * * * "

Spalding attacks this position of the Commission claiming that it is as illogical to aggregate the various product lines into an "industry line of commerce" as it is to separate a product line into higher and low priced categories since " 'a line of commerce' may consist of only competitively indistinguishable products." Here, it submits, the record shows that there are no competitive relationships between the product lines which can justify grouping them as a single line of commerce.

Spalding again relies on Columbia Pictures and Brown Shoe this time to support its contention that the athletic goods industry lacked the necessary competitive interrelationships to justify it as a line of commerce.

Spalding also argues that it is "specious" to justify an industry line of commerce on the basis of the findings of the Commission that:

" * * * These products (listed in the AGMA reports) are manufactured and sold by Spalding and formerly had been manufactured and sold by Rawlings."

and that

" * * * the athletic goods industry is recognized by its members and by its trade association as a separate and distinct industry."

It contends that the first finding "gives no insight into the area or areas of effective competition for those product lines" and "serves only to show the relevance to this proceeding of whatever lines of commerce are found to include one or more of those product lines." Spalding

contends that the second finding of the Commission is ineffective to "show either that such products are themselves competitively related or are as to other products competitively unrelated."

Finally Spalding argues that if there is any concept that would justify the aggregation of the product lines into an "economically related mass" it is the concept "that a host of products compete for the consumer dollars that are spent on physical recreation." Under such a definition Spalding contends that an industry wide line of commerce in this case must include not only the product lines listed in AGMA reports, but also "equipment used in a multiplicity of other established and well recognized athletic games." It cites the 1954 Census of Manufactures, compiled by the Department of Commerce, as supporting the conclusion that the sporting and athletic goods industry must include many products outside the "narrow AGMA frame of reference adopted by the Commission", such as bowling and billiard equipment, gymnasium and playground equipment, hunting and fishing gear and sporting arms and ammunition.

We do not share Spalding's view that a logical dilemma was created when the Commission aggregated what it had found to be lines of commerce in this case, viz., higher and lower priced athletic products, each competitively distinct from the other, into an industry line of commerce. Spalding's assertion that an inconsistency is brought about because a single line of commerce may consist of only "competitively indistinguishable" products does not follow. The Commission has found from the evidence before it that there are competitive relationships between the lines of commerce warranting them to be aggregated as a group for the purpose of measuring the impact of the merger on competition.

The products are grouped together for distribution, by at least each of the four principal manufacturers and sellers, Spalding, Rawlings, Wilson and Mac-Gregor, in their respective catalogues of merchandise, displaying the several items according to seasonal demands for equipment for games such as baseball, golf, softball, tennis, badminton and volley ball in their spring and summer catalogues. Football, basketball and boxing equipment are featured in those issued for the fall and winter. The market in which the products are sold is a recognized one with its own competitive standards. Each of the general line companies integrated its products for promotion by way of national advertising, adoption contracts and endorsements by prominent figures in the athletic world resulting in competitive interrelationships between the product lines of commerce.

The Commission did not rely for its conclusion that the athletic goods industry was a line of commerce only on its finding that AGMA listed products were manufactured and sold by both Spalding and Rawlings and that the athletic goods industry is recognized by its members and trade association as a separate and distinct industry. In addition, it had before it the foregoing evidence of the pattern of a market area on which to base its conclusion that there was an athletic goods industry and that the industry in itself, was a line of commerce whereby the impact of the merger could be measured to ascertain whether it transgressed Section 7.

It is true, as suggested by Spalding, that the 1954 Census of Manufactures of the United States Department of Commerce [13] included in its survey of sport-

---

13. The Bureau of the Census of the United States Department of Commerce grouped for statistical purposes athletic goods and sporting goods establishments inclusively under the title "Sporting and Athletic Goods" with the following explanatory note:

"*3949—Sporting and Athletic Goods* (Full Standard Industrial Classification Title: Sporting and Athletic Goods, N.E. C. [not elsewhere classified])

"This industry comprises establishments primarily engaged in manufacturing sporting and athletic goods, n.e.c. such as fishing tackle; golf and tennis goods; baseball, football, basketball and boxing equipment; roller skates and ice skates; gymnasium and playground equipment;

ing and athletic goods, equipment used in games other than those specified in the AGMA reports. But that does not dictate the enlargement of the boundaries of the athletic goods industry as viewed in this case. The Census of Manufactures was designed as a statistical report upon the sporting and athletic goods manufacturers on a broad and comprehensive sweep. The athletic goods industry in this case was defined by the manufacturers of athletic equipment through AGMA as distinctive and separate. As has been said, its products were equipment for use in the established and well recognized games of baseball, softball, basketball, golf, tennis, badminton, soccer, volley ball and boxing for the most part performed to large spectator groups. The sporting and athletic goods and equipment outside the AGMA classifications are foreign to the products which were established as forming the athletic goods industry as it existed and as it was known at the time of this merger.

Spalding again refers to Columbia Pictures and urges that it "demonstrates the nature of the competitive interrelationships necessary to find an industry line of commerce." As has been noted, supra, the court in that case refused to find a separate and distinct line of commerce or product market limited to feature films, in the light of the factors which indicated that feature films were devoid of significant distinctiveness from other types of television programming material.

The question of whether an industry may be regarded as a line of commerce was not considered in Columbia Pictures and nothing in the case militates against the conclusion by the Commission here that the athletic goods industry as a whole constitutes a line of commerce.

In United States v. Brown Shoe Company, Inc., supra, cited by Spalding, the

court observed that there was "a close question as to whether 'shoes—as such' could be treated as a 'line of commerce.' " Having viewed the facts of the case, i. e., "the practices in the industry, the characteristics and uses of the products, their interchangeability, price, quality and style", it found that it could be "unfair and unjust" to classify shoes as a whole as a line of commerce.

It declared that "all 'men's shoes' ", "all 'women's shoes' " and "all 'children's shoes' ", are regarded by the entire industry and the public as separate and independent classifications, regardless of price and intended use. It held that each classification has sufficient peculiar characteristics and uses to make it distinguishable and a separate line of commerce. However, these considerations do not influence the circumstances of this case, where the Commission found facts upon which to conclude that there were significant competitive interrelationships between athletic products as a group to justify the recognition of the athletic goods industry as a line of commerce.

In this case the Commission was guided by the holding in United States v Bethlehem Steel Corp., supra:

" * * * The products of the iron and steel industry are generally distinct one from the other and as a group distinct from the products of other industries. They are sold in a recognized market with its own competitive standards. The iron and steel industry is commonly recognized by its members as well as the community at large as a separate industry. It has its own trade association, treating the industry as separate and distinct. In the light of these facts the conclusion is warranted that the sum of all the products of the iron and steel industry constitute a line of commerce. Since Bethlehem and Youngstown both

billiard and pool tables; and bowling alleys and equipment. Also included in this industry are establishments primarily engaged in manufacturing athletic and

sporting gloves, shin guards, helmets, shoulder pads, chest protectors and similar items."

produce and sell the principal products of the iron and steel industry, it is an appropriate line of commerce for analyzing the effect of this merger." 168 F.Supp. at p. 594.

In general, that declaration of the court in Bethlehem Steel has application here, but the facts in every case based on Section 7 of the Clayton Act may be expected to and do differ. As was said in Brown Shoe:

"Thus, a review of the cases leads this Court to the conclusion that each case must stand upon its own facts as to the determination of the area or areas of effective competition. This area must be determined by economic reality and not necessarily by political boundaries or with mathematical precision. * * *" 179 F.Supp. at p. 733.

▄ Here the Commission, in accordance with its own admonition in Brillo Manufacturing Company, supra, made its determination of the relevant market on more than a finding only that the products were being produced by both the acquiring and acquired companies. It has considered additional factors and properly determined that the athletic goods industry as a whole is a relevant market within which to measure the impact of the merger.

### Relevant Geographic Area

Before turning to the problem of the impact of the merger on the relevant lines of commerce a determination should be made of the geographical dimension or relevant "section of the country", with the meaning of Section 7.

The Hearing Examiner held that the relevant geographical area to be considered for the purpose of determining the effects of the acquisition on competition was the entire United States, stating, among other things:

"Spalding distributes its products through wholesale distributing depots and sales offices located throughout the United States. Prior to 1952, such facilities were located in Chicopee, Massachusetts; Boston, Massachusetts; New York, N. Y.; Philadelphia, Pennsylvania; Washington, D. C.; Chicago, Illinois; and Los Angeles, California. Subsequent to 1952 Spalding has had distribution offices in Seattle, Washington; Dallas, Texas; Miami, Florida; and Atlanta, Georgia. * * *"

* * * * * *

"Rawlings distributed its products nationally for many years prior to the date of its acquisition by Spalding. It maintained branch offices in Los Angeles, California, and Chicago, Illinois. The strength of its distribution system is revealed by a statement of its President in 1952, as follows:

"'Rawlings now maintains a national sales force and has also developed outlets for its brands in foreign markets. * * *'"

The Commission approved the Hearing Examiner's adoption of the United States as the appropriate geographical market, stating:

"* * * The record establishes that both Spalding and Rawlings distributed their products throughout the United States and that purchasers of such products are located in all sections of the country. Moreover, competing manufacturers and sellers of athletic goods are located throughout the United States. The adoption of the United States as the appropriate geographical market does not implicitly assume that Spalding and Rawlings directly competed for every sale they made, as contended by respondent, nor does it assume that these two firms were equally strong factors in competition in every section of the country. Under Section 7, 'section of the country' may include any market area in which the acquired and acquiring firms do business and may cover potential, as well as actual, competition. Pillsbury Mills, Inc., 50 F.T. C. 555 (1953). As stated by the

Court in United States v. Bethlehem Steel Corporation, supra:

" ' * * * section 7 is intended to protect buyers as well as competing sellers. Therefore, section of the country must be determined with respect to both buyers and sellers. The determination must be made on the basis of not only where the companies have in the past made sales, but also on the basis of where potentially they could make sales and where buyers could reasonably turn to them as alternative substantial sources of supply.' "

■ This holding of the Commission is questioned by Spalding which contends that the evidence indicates regional markets rather than a nationwide one. Spalding refers to statistics in the record arguing that 80% of Rawlings' products were sold in 19 Southern and Midwestern states most accessible to Rawlings' Missouri plants and that only 1.6% were sold in the 13 eastern seaboard states. Cited is the finding in American Crystal Co. v. Cuban-American Sugar Co., supra, where a 10 state area was found to be the relevant market area, despite the fact that both the acquired and acquiring companies and their competitors sold substantial amounts of sugar outside that area. However, there the geographic market was defined as 10 states—the so-called River Territory in the middle west—because there was specially active competition between the proposed merging companies and their competitors in a market that was subject to the common economic forces in the designated territory. No such characteristics define any geographic division of the United States for athletic goods. As the Commission found the record establishes that both Spalding and Rawlings distributed their products throughout the United States and that purchasers of such products and competitors of Spalding and Rawlings are located throughout the country. The Commission's finding that the appropriate "section of the country", as

contemplated by Section 7, was in this case the entire United States was proper.

SPALDING'S CONTENTIONS THAT CONCENTRATION IS LOW AND DECLINING

In support of its position that the impact of this merger fails to disclose the probability of lessening of competition or tending to monopoly in any line of commerce Spalding asserts that contrary to the finding of the Commission that the sporting and athletic goods industry is highly concentrated or exhibiting a tendency toward concentration, it, if anything, shows a trend toward deconcentration.

Spalding charges that any conclusions the Commission may have reached on the levels of concentration in the industry are erroneous as based upon "the unreliable quality of the quantitative data", derived from figures in the AGMA reports. They are, asserts Spalding, defective, in that only one since 1950 have participating companies numbered as many as 80 although there are approximately 200 companies manufacturing products covered by the AGMA reports and the reporting sample not only changes from year to year but increased from 74 reporting companies in 1954 only to 75 in 1955 while the total number of manufacturers increased from 184 to 197. It cited the complete omission from AGMA records of the Royal Manufacturing Company, a firm from which Spalding made purchases of gloves and mitts prior to the acquisition and which is not even listed as a manufacturer to which AGMA questionnaires were sent.

It also complains that AGMA reports overstated the market shares of all participating companies because they fail to reflect that a substantial volume of athletic goods is imported into the United States each year.

In addition Spalding suggests that the dollar figures in the AGMA reports are "nearly meaningless" because they do not represent actual sales in any given product line, but are fictitious values arrived at by multiplying a participating manu-

facturer's low list selling price by the number of units produced and sold. As an illustration it cites its own practice in reporting on baseballs under instructions from AGMA. It reported that it had sold in 1955 to professional baseball leagues 20,170 dozens at its low list selling price of $21.60 per dozen or $435,672, when in fact it received only $137,798, for the baseballs thereby inflating its market share by more than 3 percentage points or by over 17 percent.

Moreover Spalding urges that AGMA dollar figures are misleading because they do not take into consideration the theoretical possibility that a manufacturer at lower cost could by reason of its advantage sell more top quality baseballs cheaper than Spalding, which, on the basis of its higher unit price, would place it, Spalding, in a rank above the competing manufacturer in terms of dollar values reported to AGMA.

Spalding further challenges the Commission's conclusion as to high concentration in the manufacture of baseballs, claiming, on the contrary, that it is low. It presented the following table of manufacturers' shares of the volume of baseball production: [14]

| Manufacturer | Share of Units Reported to AGMA 1954 | Share of Units Reported to AGMA 1955 |
|---|---|---|
| Lannom | 18.8% | 19.2% |
| Spalding | 16.5% | 15.3% |
| de Beer | 16.2% | 17.9% |
| Wilson | 16.1% | 17.5% |
| MacGregor | 10.9% | 10.2% |
| Rawlings | 10.5% | 9.4% |
| Tober | 3.9% | 4.8% |
| Hofran | 3.8% | 3.1% |
| Sealand | 1.7% | 1.4% |
| Harwood | 1.5% | 1.2% |
| Kennedy | Less than .1% | Less than .1% |

Spalding charges that these figures disprove the finding of the Commission that Spalding, Rawlings, Wilson and MacGregor dominate competition in the product line of baseball. It states that in the two years prior to the acquisition there were at least 13 manufacturers which were producing and selling baseballs, including Spalding and Rawlings. According to the AGMA report 11 companies produced 603,928 dozens valued at $7,003,330 in 1954 and 689,349 dozens valued at $7,425,906 in 1955. Of these in 1954, a single line company, Lannom, was the largest seller and producer with another single line company, de Beer, only 3/10 of 1% behind Spalding, which occupied second place. In 1955 Lannom and de Beer were the largest sellers and producers while Spalding was fourth and Rawlings sixth. Spalding argues that the preeminence of Lannom and de Beer in baseballs underscores the error of the Commission's finding that Spalding, Rawlings, Wilson and MacGregor dominate the manufacture and sale of all product lines. It states that those companies are not the four largest in terms of quantity in any product line and only in baseballs are they the largest in terms of AGMA dollar values which it characterizes as meaningless. Spalding claims

14. In addition to the above Spalding asserts that there are at least two other baseball producers—George Young & Co., with annual sales of $175,000 and Dudley Sports Co., with sales of $332,295.

that a single line company always does the largest volume of business in the various product lines.[15]

Spalding further questions the Commission's use of the terms "high degree of concentration" and "oligopolistic" with relation to the market portion in baseballs of Spalding, Rawlings, Wilson and MacGregor where the annual value of production amounted to only $7,500,-000 shared by at least 13 separate manufacturers. Spalding emphasized that of 11 companies participating in AGMA each of six produced more than 9% but less than 20% of reported production in both 1954 and 1955. (See table page 38)

Spalding contends that the record not only compels the inference that the concentration in the manufacture and sale of sporting and athletic goods is already low but also that it is demonstrable that the levels of concentration are declining. It states that Dudley Sports Co., a new manufacturer, began the production of baseballs in 1955 with relatively small capital investment and by 1957 had sales of $332,295, although its assets amounted to but $76,000 and it employed only five workers and that George Young & Co., a manufacturer of top quality baseballs sold $175,000 with only five employees and limited floor space. Several examples were cited by Spalding in the production lines other than baseballs, where firms sold allegedly a substantial volume of sporting and athletic goods on modest capital investments and labor forces.[16]

Spalding also speaks of two large industrial companies, Voit Rubber and General Tire & Rubber, presently engaged in the manufacture of softballs, as potential entrants into baseball, a closely related product line.

Spalding asserts that there is no evidence concerning the mortality rate

15. It presents the following table of percentage of AGMA totals in 1954 and 1955 of some single line companies in various product lines:

| Item of Athletic Goods | Major Single-Line Company | AGMA 1954 | Total 1955 |
|---|---|---|---|
| 1. Badminton racket frames | Cortland Line Co. | 94.9% | 91.9% |
| 2. Badminton shuttlecocks | R.S.L. Shuttlecocks Co. | 98.4 | 100.0 |
| 3. Baseballs | Lannom Manufacturing Co. | 18.8 | 19.2 |
| 4. Baseball bats | Hillerich & Bradsby Co. | 51.7 | 56.3 |
| 5. Basketballs | W. J. Voit Rubber Corp. | 35.1 | 24.2 |
| 6. Boxing gloves | Everlast Sporting Goods Mfg. Co. | — | 43.2 |
| 7. Footballs | Barr Rubber Co. | — | 36.8 |
| 8. Football helmets | Hutchinson Bros. Leather Co. | 27.0 | 28.3 |
| 9. Football shoulder pads | Hutchinson Bros. Leather Co. | 29.6 | 34.4 |
| 10. Golf bags | Atlantic Products Co. | 43.7 | 41.0 |
| 11. Golf balls | U. S. Rubber Co. | 28.1 | 27.4 |
| 12. Soccer balls | W. J. Voit Rubber Corp. | 51.7 | 50.7 |
| 13. Softballs | J. de Beer & Son | 17.9 | 18.4 |
| 14. Softball bats | Hillerich & Bradsby Co. | 67.4 | 66.0 |
| 15. Tennis balls | Pennsylvania Division General Tire & Rubber Co. | 56.5 | 57.2 |
| 16. Volley balls | W. J. Voit Rubber Corp. | 43.1 | 41.6 |

16. Spalding lists the companies, their products and annual sales as follows:

| Name of Company | Product | Annual Sales |
|---|---|---|
| Ben Hogan Co. | Golf clubs | $1,750,000 |
| Regents Sporting Co. | Tennis and badminton equipment | 1,500,000 |
| Kenneth L. Smith | Golf clubs | 500,000 |
| Elco Football Equipment | Football equipment | 50,000 |

Each company is alleged to have modest manufacturing facilities and few employees.

among baseball manufacturers and that except for three small bat manufacturers, the Commission cannot point to any specific manufacturer of sporting and athletic goods which has failed, in contrast to the statement in the Commission's opinion that

> " * * * the industry's mortality rate is high [and] the highest mortality has been among the smaller single line firms."

As a final argument that concentration in sporting and athletic goods is low and declining Spalding submits that the combined market shares of Spalding, Rawlings, Wilson and MacGregor generally declined from 1954 to 1955 in every product line manufactured by them, namely, baseballs, footballs, softballs, volley balls and soccer balls and that the individual shares of Spalding and Rawlings decreased except in soccer balls. In this connection Spalding draws attention to the overall industry growth according to AGMA reports from $132,379,773 in 1954 to $148,521,348 in 1955, an increase of 12.2 percent and that none of the four general line companies achieved the same rate of increase. It shows that Spalding's overall production actually declined 1 percent from 1954 to 1955 and that its production combined with that of Raw-

lings showed a decline of $121,239 in 1955.

## CONCLUSIONS AS TO CONCENTRATION

Before discussing other contentions of Spalding that concentration is low and declining, it is in the interest of orderliness to investigate its charges that the AGMA reports are unreliable. Spalding criticizes the reliability of data derived from AGMA reports, but it is to be observed that such data was supplied by members of the industry for their use and that they relied upon them. AGMA's figures may be substantially reconciled with those of the United States Census of Manufactures Reports as is manifest from an analysis of the figures for baseballs for the year 1954.[17] AGMA figures also represented a similarly substantial percentage of the quantities listed in the United States Census of Manufactures for other products.[18] It is true that only about 40% of the total number of firms in the athletic industry are reported upon in the AGMA statistics, but that participating segment included the largest and most important producers and accounted for 90% of the total volume of athletic goods produced by the industry for the years 1954 and 1955, as found by the Hearing Examiner, which finding was

17. Counsel for the Commission presented the following comparison of AGMA figures for baseballs for the year 1954:

| Baseballs | United States Census of Manufactures | AGMA Census |
|---|---|---|
| Industry totals (dozens) | 574,000 | 604,000 |
| Spalding, market share | 17.8% | 16.5% |
| Rawlings, market share | 11.2% | 10.5% |
| Wilson, market share | 19.0% | 16.1% |
| MacGregor, market share | 11.4% | 10.9% |

18. Following are the AGMA percentages of the United States Census of Manufactures for 1954 for products other than baseballs as submitted by counsel for the Commission:

| Products | AGMA Percentages of U. S. Census of Manufactures |
|---|---|
| Golf balls | 96.2 |
| Golf clubs (irons) | 90.6 |
| Golf clubs (woods) | 90.3 |
| Tennis balls | 94.5 |
| Footballs | 73.8 |
| Basketballs | 94.1 |

approved by the Commission and is uncontradicted.[19]

Why the production figures of the Royal Manufacturing Company in gloves and mitts for 1955 were not included in the AGMA reports is unexplained but the omission of the production of one manufacturer of a single product cannot be said to condemn the value of the AGMA data which otherwise appear to be reasonably comprehensive.[20]

Evidence of the effect of importing or rather the lack thereof urged by Spalding to challenge the value of the AGMA data is likewise inconclusive. The evidence of imports is peripheral, revolving around the minutes of meetings of AGMA on April 21, 1954, April 19, 1955 and October 12, 1955, when Mr. Fred Bowman, as Chairman of AGMA's Federal Agencies Committee comments on an increase in "the import of such items as tennis equipment, golf equipment, baseballs and other items from European countries and Japan" and of his endeavors to brief the United States Tariff Commission on the subject. A record of the information on financial and business operations of sporting goods firms not participating in 1954 and 1955 AGMA census of athletic and sporting goods obtained from Dun and Bradstreet disclosed two importing companies—American Import Company and General Sportscraft Company, Ltd. The former is reported to have imported sporting goods in addition to novelties, general display items, basketware, floor coverings, chairs and toys. The latter specialized in badminton accessories, ping pong sets, field hockey, tennis equipment and dart boards. Neither instance reflects with any degree of clarity the character of the importations in relation to the subject matter of the amounts thereof.

Nor can the value of the AGMA data be destroyed by Spalding's charge that its market value was inflated by its report of receipts for baseballs sold to professional baseball leagues in much greater amount than it actually received therefor, because Spalding reported in 1955 sales of baseballs to professional leagues at its low list selling price when it actually received far less for this merchandise. If effect is given to the actual sales price in this regard, Spalding's percentage of the baseball market for 1955 in terms of dollar value would be 18.6% instead of 21.8%, or a difference of 3.2 percentage points. Although, as Spalding points out, this amounts to a 17% inflation of its market share, it still does not affect its rank as second only to Wilson. (See table page 16, supra)

As contended by the Commission's counsel AGMA's records fail to disclose any manufacturers at low cost listed by Spalding that produced higher priced baseballs in quantities approaching those produced by Spalding. This effectively disposes of Spalding's argument that as a higher cost higher priced producer a misleading inference might be drawn from AGMA's data as to its market share in dollar value in the event a hypothetical manufacturer at lower costs undersold Spalding.

In considering Spalding's position with regard to concentration, it is to be noted that the Commission has properly found the athletic goods industry and the higher priced categories within product lines to be relevant lines of commerce, whereas Spalding holds steadfastly to the ar-

19. In a letter of October 13, 1955 from AGMA to the United States Tariff Commission it is stated that its member firms produce 90% of the volume of athletic equipment and sporting goods manufactured in the United States. (Commission's Exhibit 167)

20. It is also alleged that comparisons between the years 1954 and 1955 may not be made reliably in footballs and boxing gloves because the production of three firms (Collette Manufacturing Co. and Barr Rubber Co. as to footballs and Everlast Sporting Goods Company as to boxing gloves) are unreported in 1954 but are included in substantial volume in 1955. That these companies produced at all in 1954 is left to assumption and in any event the reliability of the AGMA data as bearing upon the issues of this case is not substantially affected by the omission.

gument that only the respective product lines of sporting and athletic goods constitute relevant lines of commerce.[21] Thus, Spalding's arguments ignore factors revealing the degree of concentration present in relevant lines of commerce and the increase of concentration therein, precipitated by the acquisition.

In connection with the question of concentration in the athletic goods industry, counsel for the Commission introduced a compilation of the 1955 sales of 75 producers of athletic goods, as reported to AGMA (Commission's Exhibit 359) which shows total sales amounting to $148,521,348 and the individual percentages realized by each company. Nineteen companies with an excess of 1% of the total sales are listed, with their sales and percentages, as follows: [22]

| | Companies | Total Sales (Millions of Dollars) | Percentage of Sales |
|---|---|---|---|
| 1. | Wilson | $26.7 | 18.0 |
| 2. | Spalding | 18.6 | 12.5 |
| 3. | MacGregor | 14.8 | 9.9 |
| 4. | Rawlings | 9.0 | 6.0 |
| 5. | Voit | 6.8 | 4.6 |
| 6. | Acushnet | 5.4 | 3.7 |
| 7. | Hillerich & Bradsby | 5.2 | 3.5 |
| 8. | Hyde Athletic Shoe | 4.9 | 3.3 |
| 9. | U. S. Rubber | 4.8 | 3.2 |
| 10. | Sealand | 3.7 | 2.5 |
| 11. | Dunlop | 3.5 | 2.4 |
| 12. | General Tire | 2.7 | 1.8 |
| 13. | Boston Athletic Shoe | 2.6 | 1.8 |
| 14. | Dubow | 2.3 | 1.6 |
| 15. | Hutchinson | 2.2 | 1.4 |
| 16. | Atlantic Products | 2.0 | 1.4 |
| 17. | Endicott-Johnson | 1.9 | 1.3 |
| 18. | Worthington Ball | 1.7 | 1.1 |
| 19. | Seamless | 1.6 | 1.1 |

As found by the Commission the four general line companies, Spalding, Rawlings, Wilson and MacGregor, accounted for 46.4% of the total and the next 15 companies accounted for 34.7%, leaving to all the remaining producers 18.9%. The merger brought together Spalding with 12.5% and Rawlings with 6.0% in dollar value of the industry as represented by the AGMA reports giving Spalding the edge over Wilson. There-after three companies instead of four, Spalding, Wilson and MacGregor sold 46.4% in dollars of the total sales volume of the industry. The shares of Voit Rubber Company and Acushnet Process Sales Co., are respectively fifth (4.6%) and sixth (3.7%), and the remaining producers' shares drop gradually.

When focus is brought to bear on the higher priced, higher quality baseballs (selling for over $9.00 per dozen) for the

21. The insistence of Spalding that only product lines are the relevant lines of commerce therefore likewise invalidates the detailed analyses of the competitive situations in the 19 product lines made by Spalding for the Commission and submitted in the Joint Appendix.

22. It is true, as contended by Spalding that these figures represent only those producers who reported to AGMA and not the entire industry. However, as heretofore stated, the figures are representative of the entire industry since they comprise 90% of the total production.

year 1955 the concentration in this line of commerce is patent. The Commission found:

"In 1955 baseballs selling for more than $9.00 a dozen comprised 76.8 percent of the total sales value of all baseballs produced. Four firms, Spalding, Wilson, MacGregor and Rawlings accounted for 83.4 per cent of the industry total in this line. Wilson was the largest producer with a market share of 26.9 per cent. Spalding was second with 26.5 per cent, MacGregor was third with 16.1 per cent and Rawlings was fourth with 13.9 per cent. The high degree of concentration already existing in this product market was further increased by the merger. Spalding's market share increased to 40.4 per cent of the industry total and one of its three major competitors was eliminated." [23]

Lannom and de Beer were leaders in the field of inexpensive baseballs but they were not in the same area of competition with Spalding and Rawlings where the market in higher priced higher quality baseballs is concerned.

Spalding's challenge to the finding of the Commission that there is a high concentration in the production of baseballs must fail.

As a result of the merger in addition to leading in the production of higher priced higher quality baseballs, Spalding gained first place in the production of higher priced basketballs, footballs and softballs, as found by the Commission from the AGMA Census Reports in its opinion, as follows:

"*Basketballs:* In 1955 the sales value of higher priced basketballs (leather and rubber covered selling for more than $48.00 per dozen) was approximately $3,800,000 or about 47 per cent of the total sales value of all basketballs produced. In that year, five firms, Voit, Spalding, Wilson, MacGregor and Rawlings accounted for 83 per cent of the total sales of this higher priced line. As

23. Attorneys for the Commission presented the following table dealing with higher priced baseballs.

"Market shares in the higher-priced baseballs [1]
(In percent)

| Company | Dollar Value | | Quantity (dozen) | |
| --- | --- | --- | --- | --- |
| | *1954* | *1955* | *1954* | *1955* |
| Wilson | 24.4 | 26.9 | 23.2 | 26.0 |
| Spalding | 26.4 | 26.5 | 23.7 | 24.0 |
| MacGregor | 16.2 | 16.1 | 15.4 | 14.7 |
| Rawlings | 15.7 | 13.9 | 16.7 | 15.3 |
| J. deBeer | 7.5 | 7.1 | 9.0 | 8.5 |
| Lannom | 5.4 | 5.4 | 6.6 | 6.6 |
| Harwood | 2.2 | 1.9 | 2.4 | 2.1 |
| Sealand | 1.5 | 1.6 | 2.1 | 2.1 |
| Tober | .6 | .6 | .8 | .7 |
| Kennedy | .1 | [3] | .1 | [3] |
| Spalding and Rawlings combined | 42.1 | 40.4 | 40.4 | 39.3 |
| Big Four [2] | 82.7 | 83.4 | 79.0 | 80.0 |

[1] Price range for highest priced baseballs, leather covered, was over $16.00 for 1955, AGMA price range for 1954 was $16.75. Medium priced baseballs price range for 1955, leather covered was $9.01 to $16.00, AGMA price range for 1954 was $9.01 to $16.75.

[2] Includes Spalding, Rawlings, Wilson, MacGregor.

[3] Less than one-tenth of 1 percent.

Sources: CX 278–A to Z–36, CX 353–A to Z–7.

Note.—Rankings of companies are based on 1955 dollar value figure."

a result of the acquisition, Spalding's market share, computed on a value basis, increased from 19.8 per cent to 31.2 per cent, making Spalding the leader in this line.

*"Footballs:* In 1955 the sales value of higher priced footballs (leather and rubber covered selling for more than $45.00 per dozen) was approximately $1,600,000 or about 33 per cent of the total sales value of all footballs produced. In that year Spalding, Voit, Wilson, MacGregor and Rawlings had a combined market share of 86.4 per cent in this line. Spalding had been the largest producer, on the basis of dollar sales, prior to the merger and by the acquisition of Rawlings increased its lead from 24.9 per cent to over 33 per cent of the industry total.

*"Softballs:* In 1955 the sales value of higher priced softballs (leather and rubber covered selling for more than $9.00 per dozen) was approximately $3,000,000 or 79 per cent of the total sales value of all softballs produced. Spalding was the fifth largest producer in this line and Rawlings was the seventh largest. Seven firms, including Spalding, Rawlings, Wilson and MacGregor, accounted for about 87 per cent of the total industry production. As a result of the merger, Spalding became the leading producer in this higher priced line, with a market share of 20 per cent." [24]

24. Following are tables presented by the attorneys for the Commission revealing the market shares in the above relevant lines of commerce:

"Market shares in the higher-priced basketballs [a]

| | Dollar Value | | Quantity (dozen) | |
| Company | 1954 | 1955 | 1954 | 1955 |
| | Percent | Percent | Percent | Percent |
| Voit | 30.8 | 25.2 | 36.6 | 28.0 |
| Spalding | 16.7 | 19.8 | 17.5 | 24.5 |
| Wilson | [e] 8.9 | 14.4 | [e] 5.5 | 8.9 |
| MacGregor | 11.6 | 12.2 | 7.3 | 8.8 |
| Rawlings | 9.9 | 11.4 | 5.4 | 7.3 |
| General Tire [c] | 10.2 | 6.5 | 12.8 | 8.1 |
| Seamless Rubber | 5.9 | 6.4 | 6.2 | 8.7 |
| Sun Rubber | 3.7 | 1.7 | 6.0 | 2.8 |
| J. A. Dubow | 1.8 | 1.5 | 2.2 | 1.9 |
| Hutchinson Bros. | .2 | .3 | .3 | .4 |
| Geo. A. Reach | .3 | .3 | .2 | .2 |
| Nocona | — | .2 | — | .3 |
| Kennedy | [d] | .1 | [d] | .1 |
| Spalding and Rawlings combined | 26.6 | 31.2 | 22.9 | 31.8 |
| Big Four [b] | 47.1 | 57.8 | 35.7 | 49.5 |

[a] Price range for highest priced basketballs for 1954 and 1955: Leather molded —Up to $145.00; Over $145.00. Medium priced basketballs include leather sewed and rubber. Price range for rubber was $48.01 and over for 1955, $40.01 and over for 1954.

[b] Includes Spalding, Rawlings, Wilson, MacGregor.

[c] Includes Pennsylvania Rubber Company.

[d] Less than one-tenth of 1%.

[e] Includes acquired company, Ohio-Kentucky Mfg. Company.

Note: Rankings for companies are based on 1955 dollar value figure.

Sources: CX 278–A to Z–36, CX 353–A to Z–7."

"Market shares in the higher-priced footballs [a]

| | Dollar Value | | Quantity (dozen) | |
|---|---|---|---|---|
| Company | 1954 Percent | 1955 Percent | 1954 Percent | 1955 Percent |
| Spalding | 29.1 | 24.9 | 27.7 | 23.3 |
| Voit | 18.7 | 22.4 | 22.6 | 23.5 |
| Wilson | [d] 18.9 | 20.1 | [d] 17.3 | 20.3 |
| MacGregor | 11.3 | 10.5 | 9.9 | 9.4 |
| Rawlings | 9.0 | 8.5 | 7.2 | 7.3 |
| General Tire [c] | 5.3 | 4.9 | 6.9 | 6.0 |
| Seamless Rubber | 3.3 | 3.9 | 3.2 | 4.4 |
| Sun Rubber | .5 | 1.4 | .6 | 2.0 |
| Hutchinson Bros. | 1.0 | 1.1 | 1.1 | 1.3 |
| Geo. A. Reach | 1.3 | 1.0 | 1.4 | 1.1 |
| J. A. Dubow | 1.4 | .7 | 1.9 | 1.0 |
| Kennedy | .2 | .2 | .2 | .3 |
| Nocona Leather | — | .4 | — | .1 |
| Spalding and Rawlings combined | 38.1 | 33.4 | 34.9 | 30.6 |
| Big Four [b] | 68.3 | 64.0 | 62.1 | 60.3 |

[a] Price range for 1954 and 1955 highest priced footballs: $90.00 and over—Leather. Price range for medium priced footballs for 1955: Leather—$48.01 to $89.99; Rubber—$45.01 and Up. AGMA price range for 1954 medium priced footballs: Leather—$48.01 to $89.99; Rubber—$42.01 and Up.

[b] Includes Spalding, Rawlings, Wilson, MacGregor.

[c] Includes Pennsylvania Rubber Company.

[d] Includes acquired company, Ohio-Kentucky Mfg. Company.

Note: Rankings of companies are based on 1955 Dollar Value Figure.

Sources: CX 278–A to Z–36, CX 353–A to Z–7."

"Market shares in the higher-priced softballs [a]

| | Dollar Value | | Quantity (dozens) | |
|---|---|---|---|---|
| Company | 1954 Percent | 1955 Percent | 1954 Percent | 1955 Percent |
| Voit | 16.3 | 15.9 | 17.4 | 17.9 |
| Wilson | 14.6 | 15.0 | 12.6 | 11.3 |
| MacGregor | 14.6 | 14.8 | 12.2 | 11.7 |
| J. DeBeer | 13.3 | 13.9 | 18.2 | 19.6 |
| Spalding | 11.8 | 11.5 | 11.7 | 11.5 |
| Harwood | 7.8 | 8.7 | 6.8 | 7.1 |
| Rawlings | 10.1 | 8.1 | 9.5 | 7.8 |
| Hofran | 3.1 | 3.9 | 3.0 | 3.9 |
| General Tire [c] | 2.4 | 3.2 | 2.7 | 4.2 |
| Lannom | 3.5 | 2.9 | 3.4 | 2.8 |
| Sealand | 1.8 | 1.7 | 1.7 | 1.7 |
| Tober | .7 | .4 | .8 | .5 |
| Kennedy | [d] | [d] | [d] | [d] |
| Spalding and Rawlings combined | 21.9 | 19.6 | 21.2 | 19.3 |
| Big Four [b] | 51.1 | 49.4 | 46.0 | 42.3 |

[a] Highest priced softballs price range for 1954 and 1955 leather covered softballs was over $16.75; medium priced softballs include Molded or Rubber and Leather Covered. Price range for Leather Covered for 1954 and 1955 was $9.01 to $16.75.

[b] Includes Spalding, Rawlings, Wilson, MacGregor.

[c] Includes Pennsylvania Rubber Company.

[d] Less than one-tenth of one percent.

Note.—Rankings of companies are based on 1955 Dollar Value Figure.

Sources: CX 278–A to Z–36, CX 353–A to Z–7."

The argument made by Spalding that concentration in the athletic goods industry is actually declining is not substantiated. It suggests that because Commission's Exhibit 31 purports to list all manufacturers of sporting and athletic goods for 1954 and Commission's Exhibit 32 purports to list all of them for 1955, and since there are 23 firms on Exhibit 32 which do not appear on Exhibit 31 Spalding assumes they are "most likely new entrants." This involves too great a speculation as to where and under what circumstances these 23 firms commenced business.

It is a fact that Mr. Goldsmith, Chairman of the Board of MacGregor, a witness, as mentioned heretofore, testified that George Young & Company was one of eight top quality baseball producers. This company is listed in the Dun and Bradstreet report as manufacturing baseballs principally, but also softballs (Commission's Exhibit 367). No information is available as to the volume of each product. Dudley Sports Company is also listed in the same report as making baseballs principally but it also produces "softballs, volley balls, Dudley Automatic Pitching Machines, badminton game called Shuttleloop". We are uninformed as to the price of the baseballs or the proportion they bore to the balance of its products.

These firms and the four others cited by Spalding did not respond to AGMA's requests for information in 1954 and 1955 and the evidence concerning them upon which Spalding relies is gleaned from the above mentioned report of Dun and Bradstreet. It is not sufficiently informative as to the time or circumstances concerning the establishment of these companies to substantiate Spalding's claim that concentration in the sporting and athletic goods industry is declining and particularly it lacks substance to show any decline in the concentration of producers of higher priced-higher quality athletic goods.

Speculation is further expanded by Spalding's suggestion that Voit Rubber and General Tire may be potential entrants into the manufacture of baseballs. There is no evidence of any such impending step except that those companies now manufacture softballs, "a closely related line".

In its opinion, the Commission, speaking of the possibility of a firm replacing Rawlings as a strong competitive factor in the industry as being exceedingly remote, said:

"* * * The record shows that it is not only difficult for smaller firms to grow in this industry, it is also difficult for them to survive. According to the uncontradicted testimony of the witness Goldsmith, the industry's mortality rate is high. A number of companies handling a partial line of athletic products have gone out of business but the highest mortality has been among the smaller, single line firms. * * *"

It is out of this context that Spalding contends that the Commission erroneously found that the industry's mortality rate is high. Support for the Commission's statement is found in the Report of Dun & Bradstreet [25] in which firms solicited for information by AGMA in 1954 and 1955 from which no response was received are said to be "No Longer Active for Various Reasons." Three had gone into bankruptcy; two had closed their businesses, of which one suffered the sale of its assets to satisfy creditors and another was "dissolved". Four other firms were reported "Unknown Locally & Not Listed in Local Directories."

Moreover, as found by the Commission, Mr. Goldsmith testified as to the high mortality rate in the industry with particular reference to "the great quantity of individual companies, single line manufacturers, that come into the industry and go out. By reason of improper management and lack of capital and other factors." [26]

---

25. Commission's Exhibit 366.

26. The record discloses Mr. Goldsmith's testimony in this respect as follows:

"Q. Mr. Goldsmith, you have stated that you have been in the industry for a long period covering over thirty years.

The accuracy of Spalding's assertions must be granted that the four general line companies failed to show increases in volume of sales from 1954 to 1955 in proportion to the AGMA reports of all sales in those years; and that the production of Spalding individually, and in combination with Rawlings declined. However, none of the changes were radical. The net decline in combined sales of Spalding and Rawlings in 1955 of $121,239 is the difference between their 1954 sales of $27,695,524 and $27,574,285 in 1955. We regard the decline as not of sufficient substance or significance to detract from the finding of the Commission that after the merger "[a]lmost 50% of the total industry production was then concentrated in three firms, Spalding, Wilson and MacGregor", and that the concentration was intensified when consideration was given to the fact that these companies engaged primarily in the production and sale of higher quality items while many of the smaller firms engaged in the manufacture and sale of the low priced products—not significant factors in the area where Spalding and the general line firms were predominant.[27]

While we conclude that the Commission was justified in determining that, at the time of the merger, there was a high degree of concentration in the relevant lines of commerce in this case, namely the athletic goods industry as a whole and in the higher priced-higher quality athletic goods, we are aware that concentration increased by an acquisition does not of itself taint the merger. However, it is a factor that when taken together with other market facts should be scrutinized to determine whether the impact of the merger has been such as to substantially lessen competition or tend to create a monopoly in violation of Section 7.[28]

OTHER FACTORS BEARING UPON
EFFECTIVE COMPETITION

The Commission gave consideration to competitive factors involved in the

Have you ever made any studies or general surveys of the mortality rate in the industry?

"A. Going back to the early 20's I would say that I have on occasions for certain purposes made surveys.

"Q. And what has been the results of such surveys?

"A. I think the mortality rate of this business is high.

"Q. Do you recall the names of companies who were in the industry back in the 1920's or prior thereto that are no longer in existence as such?

"MR. CONNELLY: May I ask, your question is directed toward anyone in the industry or to the group that you have previously interrogated Mr. Goldsmith about described as general line companies?

"MR. KELAHER: I am referring to the industry as a whole.

"THE WITNESS: There are a number of them over a period of years who were more or less general line manufacturers who have passed out of the picture but my reference to high mortality rate has to do more specifically with the great quantity of individual companies, single line manufacturers, that come into the industry and go out. By reason of improper management and lack of capital and other factors."

27. Spalding points out that the Senate Report entitled "Concentration-American Industry", S.Rep. No. —— [Committee Print] 85th Cong., 1st Sess. 133–165 (Table 40), 196–219 (Table 42), 266–288 (Table 45) (1957), furnishes statistics showing that the degree of concentration in the sporting and athletic goods industry ranked as one of the lowest in concentration in comparison with other industries and that it was diminishing from 1947 to 1954. These statistics are not relevant, however, to the lines of commerce found by the Commission in this case, namely, the higher priced higher quality categories and the athletic goods industry as contemplated by the reports of AGMA.

Spalding also stresses that its net profits declined from 1954 to 1955 and suffered further declines after the merger in 1956 and 1957. Such facts, particularly during 1956 and 1957, when this litigation was already pending, bear no great weight in the determination of the main issues of this case.

28. See Handler and Robinson, "A Decade of Administration of the Celler-Kefauver Antimerger Act", 61 Colum.L.R. 629, 667 (1961).

manufacture and distribution of higher quality baseballs and arrived at the following conclusions:

"In considering the various competitive factors involved in the manufacture and distribution of higher quality baseballs, it appears extremely doubtful that Spalding's leadership in this line of commerce will be seriously challenged in the foreseeable future or that any change can be anticipated in the oligopolistic situation existing in this market. In addition to the competitive advantage of being general line distributors, Spalding, Rawlings, Wilson and MacGregor, over a period of many years have established reputations for quality resulting in consumer acceptance of their baseballs far surpassing that of any competitor. As found by the hearing examiner, Spalding's baseballs have been the official baseball for the two major leagues from their inception, and Spalding is now under contract to supply both leagues with their entire requirements of baseballs until 1966. That Spalding recognizes that the exclusive use of its baseballs by the major leagues greatly enhances the prestige and consumer acceptability of the trade names 'Reach' and 'Spalding' is attested by the fact that these baseballs which are ordinarily sold to dealers at $21.60 a dozen are sold for $3.74 a dozen to the American League and $4.48 to the National League. Similar adoption contracts with the minor leagues are also important factors from the standpoint of advertising and promotion of baseballs. In 1954 Spalding, Rawlings, Wilson and MacGregor had exclusive contracts to supply baseballs to 32 of the 36 minor leagues then in existence. In 1955 Spalding and Rawlings together had 14 such contracts and in 1956 they had 16.

"Other factors which have contributed greatly to the lead enjoyed by the general line firms are the endorsement contracts with star athletes, national advertising, patents, and facilities and resources for research and development. These advantages, together with the exclusive adoption contracts, have created formidable barriers to effective competition from new entrants in the field or from firms now in existence."

The Commission held that similar barriers existed in the manufacture and sale of other major higher priced product lines.

Spalding takes issue with the Commission and contends that there are no barriers to effective competition; that companies other than Spalding, Rawlings, Wilson and MacGregor have no difficulty in entering baseball manufacture or manufacture of any other product line and surviving therein; that the "assumption of the Commission that anti-competitive effects stem from the general line nature of Spalding, Rawlings, Wilson and MacGregor or from their use of trademarks, trade names, patents, contracts with athletes and leagues, etc.," is without foundation.

Spalding notes that the Commission did not introduce any evidence from manufacturers which it claimed were the victims of the alleged barriers to effective competition.

Spalding denies that the general line manufacturers enjoy competitive advantages in any line and stresses that the leading concerns in practically all the important relevant lines of commerce are single line companies, of which many are large industrial companies or subsidiaries thereof, actually not limiting themselves to a single line; that many of them purchase substantial amounts of sporting and athletic goods from other manufacturers; that Spalding long ago abandoned a truly general line as economically disadvantageous; that because neither Spalding nor Rawlings were ever true full-line companies each has always purchased products manufactured by others and that the records of such purchases by both Spalding and

Rawlings increased in 1956 after the acquisition over those of the pre-acquisition year of 1955.

Further, Spalding asserts that no competitive advantage accrued to the general line companies from their trade names or trademarks and that there was evidence that single line companies enjoyed equally fine reputations with those of the general line companies; that patents lacked importance and that in any event the universal practice is to license applicants under all patents which are obtained; that the players under endorsement contracts with the general line companies did not constitute "anywhere near all the players or star players on the teams of major or minor leagues"; and that there is no evidence as to the number of players under contracts with other baseball manufacturers or sellers; and that testimony in the case would support the contention that other manufacturers and sellers would have no difficulty in contracting for the endorsement of their products by well known athletes.

Spalding also contended that there is no evidence that the general line companies obtained any competitive advantage by reason of their contracts with baseball leagues in which their baseballs are adopted as official or that other manufacturers or sellers endeavored to obtain or were unable to obtain such contracts; and that, similarly, there is no evidence as to the competitive effect of national advertising by the general line companies or that other manufacturers are unable so to advertise.

In its reference to leadership on the part of single line companies Spalding adheres to its theory that product lines are the relevant lines of commerce. But if the Commission's theory is accepted that higher priced higher quality categories constitute lines of commerce, then it is apparent that the single line companies manifest leadership in low-priced products in the manufacture and selling of which the general line companies play little part.

That the single line companies and Spalding and Rawlings purchased products from other manufacturers and that in 1956 after the acquisition even more such products were purchased by Spalding than in 1955 are not relevant and do not effect the Commission's findings that the factors which it enumerated were responsible for the lead acquired by the general line companies. Despite these many contentions by Spalding the significant facts remain that the general line companies engaged vigorously in the practices enumerated which were designed to achieve consumer acceptance. Each general line company participated in national advertising and the record discloses, at least in so far as Spalding and Rawlings are concerned, that their expenditures in this regard were substantial. It safely may be presumed that Wilson and MacGregor each made proportionately large outlays in this field. All four firms had established trade names and trademarks over many years which had important consumer connotations. They were valuable assets and advertising them was necessary in order to gain their maximum effectiveness.

As found by the Commission each of the general line companies entered into contracts with baseball leagues. Both major leagues from their inception chose Spalding's products as their official baseballs and are under obligation to use them until 1966. The advertising value of this arrangement is such that Spalding drastically reduced its selling price of baseballs to these customers. The record bears out the substantial number of minor leagues with which the general line companies had contracts for the adoption of their baseballs as official and that Spalding and Rawlings in 1954 and 1955 had a major share of such contracts.

Each of the general line companies contracted with star athletes, top performers and others in the various sports fields for the endorsement of products or for consultative services which were made the subject of advertising and publicity. How much or how far companies other than general line companies exploited this form of publicity is not

shown, but the evidence indicates that many important personalities in the athletic world, numbering into hundreds, were in some form committed to the four general line companies. The costs in this regard were also substantial, for example in 1955 Spalding paid out approximately $148,000 for such contracts, and it is obvious that only a company with commensurate financial resources could engage in this promotional feature.

Each of the general line companies conducted research and development departments for the purpose of improving their products. When new inventions or improvements of existing patents were made it was the practice to apply for patents on them. When Rawlings was acquired by Spalding it had patent rights on approximately 80 inventions of athletic products. It is true, as Spalding asserts, that they did not affect baseballs. Apparently licenses for the use of the patents were freely granted as between general line companies and some other companies also were licensed, but the evidence is not clear that companies other than general line companies applied for and were granted licenses extensively.

In sum the general line companies over a period of many years had gained exclusive contracts to supply baseballs to the major leagues and many of the minor leagues. They had large numbers of the most prominent figures in the sports world under contract for endorsement of their products or consultation. They engaged in national advertising and publicity on a large scale. They maintained facilities for research and development and acquired patents for new inventions and improvements of their existing inventions on athletic industry products other than baseballs.

■ Each of these factors looms large in giving to the four general line companies their respective leading positions in the athletic goods industry. Spalding's contentions in this regard are in the main negative, pointing to matters that were not shown by counsel supporting the complaint before the Commission.

However, the evidence that does appear warranted the Commission's finding that these factors did exist and were prevalent as far as the general line firms were concerned, in such degree particularly when considered collectively as to pose barriers to effective competition from new entrants into the field or from firms in existence.

### Vertical Aspects

The Commission concluded that "although the merger is primarily a horizontal one it also has certain important vertical aspects." It points to the fact that Rawlings purchased many of the major products in the general line handled by it reselling them under its own trade name. The Commission cites Rawlings's purchases of such products in 1955 as being in an amount of $2,252,-371, which was an increase of 74 percent over its 1954 purchases. It associates these purchases with a statement made by Rawlings's president in 1952:

" * * * Rawlings now maintains a national sales force and has also developed acceptance for its brands in foreign markets. This sales force not only handles the products of Rawlings Manufacturing Company, but it also is becoming increasingly useful in the sale of products manufactured by others. During the last 12 years sales in that category have increased from $120,000 to $950,000 annually, and the Company's officers think a substantial volume of additional business is available in this direction. Many sporting goods manufacturers do not have the means of maintaining sales activities so large and effective as those of our Company. Such companies need the more adequate sales representation which our position offers."

Further, the Commission states that of the 29 major athletic products handled by both Spalding and Rawlings there are nine, including golf and tennis equipment, which are manufactured by Spalding and not by Rawlings; that prior to

the merger Rawlings purchased its requirements of these nine products from Spalding and other manufacturers and that by acquiring Rawlings, the Commission reasons, that Spalding if it so desires, can prevent other firms that manufacture these products from selling to Rawlings and thus cut off an important outlet for their merchandise. The Commission feels that there is reasonable certainty that this will occur and that it is supported in this view by a pre-merger announcement by Spalding that "where possible and practical as much of both lines will be manufactured in Spalding's and Rawlings's factories as seems appropriate."

Spalding characterized the 1952 statement of Rawlings's president as mere puffing and contends that in any event of the $2,252,371 worth of products purchased by Rawlings in 1955 only $142,199 represented golf and tennis equipment of the nature which Spalding could manufacture and Rawlings could not, and that in 1954, 1955 and 1956 Rawlings's purchases of these products amounted to but a very small fraction of the industry's sales in golf and tennis equipment according to the AGMA census.

An analysis of the $2,252,371 of purchases by Rawlings from other manufacturers in 1955 [29] discloses:

1. Items purchased from firms other than Spalding:

| | |
|---|---:|
| *Golf balls from U. S. Rubber | $ 25,599 |
| Golf bags from Wilson | 31,983 |
| *Baseballs from Hofran, Inc. | 5,800 |
| Bats from Hillerich & Bradsby | 73,170 |
| Masks from Schutt Mfg. Co. | 3,770 |
| *Footballs from Sun Rubber Co. | 23,400 |
| *Baseballs from Sun Rubber Co. | 118,989 |
| Badminton Shuttlecocks from R.S.L. Co. | 6,250 |
| *Volley balls from Sun Rubber Co. | 16,768 |
| *Soccer balls from Sun Rubber Co. | 15,620 |
| | $321,349 |

2. Items purchased from Spalding:

| | |
|---|---:|
| Golf and tennis equipment | 126,597 |
| 3. Shoes and Clothing | 778,162 |
| 4. Unspecified miscellaneous items | 1,026,263 |
| | $2,252,371 |

* Similar products manufactured by Spalding.

29. Commission's Exhibit No. 197.

Shoes and clothing were of course not manufactured by Spalding and there is uncertainty as to the types of the large quantity of miscellaneous items purchased by Rawlings. Of course there is no support to the prediction that Spalding would prevent its Rawlings Division from purchasing for resale shoes, clothing and other items not manufactured by Spalding on an advantageous basis and it is apparent that prior to the merger Rawlings found such purchases worthwhile since there was a steady increase in handling this type of merchandise from 1941 to 1955. On the other hand Spalding did manufacture six of the items purchased from other sources for a total value of $206,176. While this is a relatively small amount it was within the competence of the Commission to conclude that there was a reasonable probability that following the merger the suppliers of Rawlings would no longer be called upon for these products.

Another vertical aspect raised by the Commission concerns the product line of baseball gloves and mitts. Spalding did not manufacture them but was one of the largest sellers of these products. Rawlings, on the other hand, was the largest manufacturer of them. The source of Spalding's purchases of baseball gloves and mitts, in so far as the evidence discloses, may be tabulated as follows:

SPALDING'S PURCHASES OF BASEBALL GLOVES AND MITTS
1954,[1] 1955 and 1956

| Company | 1955 [2] | | 1956 [3] | |
| | Units (doz.) | Dollars | Units (doz.) | Dollars |
| --- | --- | --- | --- | --- |
| Wilson | 7,315 | 383,590 | 5,929 | 387,320.75 [4] |
| Rawlings | 8,188 | 412,074 | | |
| Franklin | 5,568 | 141,009 | | 3.56 |
| MacGregor | 623 | 25,499 | 194 | 7,982.90 |
| Royal | 2,876 | 74,187 | 8,997 | 220,730.09 |
| Kennedy | 602 | 37,668 | 1 | 78.87 |
| Stall & Dean | 1,704 | 70,676 | 1,421 | 59,762.89 |
| Totals | 26,876 | 1,144,703 | 16,542 | 675,879.05 |

[1] Commission's Exhibit 124 reveals that in 1954 Spalding purchased gloves and mitts from manufacturers aggregating 186,243 units for $732,812.75, but it does not disclose the name of the suppliers. However, in Commission's Exhibit 124a it appears that Wilson sold Spalding gloves and mitts to the amount of $236,742 in 1954.

[2] Commission's Exhibit 125.

[3] Commission's Exhibit 126. This exhibit refers to the pre-merger period and does not disclose the value of gloves and mitts supplied by Rawlings to Spalding.

[4] After 1956 Spalding no longer purchased gloves and mitts from Wilson.

———◆———

The Commission found:

"Prior to the merger, Spalding's principal suppliers of *higher priced* gloves and mitts were Rawlings, Wilson, MacGregor, Kennedy Sporting Goods Manufacturing Co., Inc., and Stall and Dean Manufacturing Co. Its requirements of all these items are now being supplied almost entirely by Rawlings. The total amount of its purchases from the other four suppliers dropped from $517,433 in 1955 to $455,149 in 1956. In 1956 Spalding's purchases of such products from Wilson amounted to $387,321. After 1956, Spalding discontinued purchasing these items from Wilson." (Emphasis supplied.)

Spalding emphatically disagrees with the Commission, claiming that Spalding's transfer of its purchases from certain companies was the result only of legitimate picking and choosing among glove and mitt suppliers. It conceded that its purchases from MacGregor, Wilson, Kennedy and Stall & Dean declined from 1955 to 1956, but pointed to its purchases from another company, Royal, which increased from $74,187 in 1955 to $220,730 in 1956. Furthermore, Spalding suggests that it is impossible from the record in this case to distinguish between higher and lower priced gloves and mitts because the evidence concerning Spalding's purchases shows actual dollars paid by Spalding while the AGMA price categories are based upon fictitious low selling prices for the product in question whether or not actually sold for that price.

The position of Spalding in this respect is not tenable. The above table furnishes both units and dollar value for purchases made by Spalding. It is apparent that in 1955 Spalding purchased gloves and mitts from Franklin in the amount of $141,000 and from Royal in the amount of $74,187. In 1956 Franklin was eliminated except for $3.56 and the purchases from Royal were increased to $220,730. It is true that the evidence does not disclose the actual per unit cost of these purchases, but the pattern is sufficiently clear to make it reasonably believable that the gloves and mitts sold by Wilson, Rawlings, MacGregor, Kennedy and Stall & Dean were higher priced than those of Franklin and Royal.

It is also clear that Spalding did not transfer its purchases of higher priced gloves and mitts from one manufacturer to another. It simply decreased its purchases of higher priced gloves and mitts from suppliers other than Rawlings after the merger and made its lower priced purchases from Royal alone rather than from Franklin and Royal.

The Hearing Examiner found that neither Mr. Bowman, President of Wilson, nor Mr. Goldsmith, Chairman of the Board of MacGregor "suggested that his company had been adversely affected by the acquisition * * *." Spalding agrees with him that the lack of testimony concerning competitive effect from these rivals of Spalding gives rise to the inference that they had no difficulty in selling gloves and mitts after the acquisition even though Spalding's purchases from them declined or ceased. The Commission disagreed with the Hearing Examiner pointing out that "the statute refers to lessening of competition and not injury to competitors." It was within the competence of the Commission to reject the inferences drawn by the Hearing Examiner and supported by Spalding in this regard.

The AGMA Census Reports indicate that the value of all gloves and mitts sold in 1955 amounted to approximately $10,597,060. Spalding was an important non-producing seller of these items. It purchased $1,144,000 of them prior to the merger of 1955 of which roughly $925,000 were the higher priced products. Spalding acquired the leading manufacturer of gloves and mitts in its merger with Rawlings which was competent to supply all its needs with a large margin over. Other manufacturers were no longer required as its suppliers of them.

■ Even if some of the Commission's views as to the vertical aspects of this merger are obscure, there can be no doubt that since the merger Spalding has the power to control the purchases made by Rawlings from manufacturers other than Spalding in the area of products made by Spalding and sold but not manufactured by Rawlings. Similarly Spalding has the power as to items manufactured by Rawlings and sold but not made by Spalding to look to its Rawlings's Division as its sole supplier. Firms looking to both Spalding and Rawlings as customers for their products could thus be eliminated.[30] Little definitive evidence of the drying up of Spald-

---

30. But see critical comments, Bork, "Anticompetitive Enforcement Doctrines Under Section 7 of the Clayton Act", 39 Texas L.Rev. 832, 836 (1961).

ing and Rawlings as sources of custom and supply to other firms was introduced, but sufficient is present to justify the Commission in its finding that there are vertical aspects of the merger that taken with all the other evidence in the case support the conclusion that the effect of the merger "may be substantially to lessen competition or tend to create a monopoly." [31]

THE FUNCTION OF APPELLATE REVIEW

We are not unmindful of the admonition, cited by Spalding, in Universal Camera Corporation v. National Labor Relations Board, 340 U.S. 474, 490, 71 S.Ct. 456, 466, 95 L.Ed. 456 (1951) that:

" * * * Congress has imposed on [Courts of Appeals] responsibility for assuring that the [Commission] keeps within reasonable grounds. That responsibility is not less real because it is limited to enforcing the requirement that evidence appear substantial when viewed, on the record as a whole, by courts invested with the authority and enjoying the prestige of the Courts of Appeals. The [Commis-

sion's] findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the [Commission's] decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both."

█ In determining the question of reasonable probability, however, it is well settled that the "weight to be given to the facts and circumstances admitted as well as the inferences reasonably to be drawn from them [are] for the Commission." Federal Trade Commission v. Pacific States Paper Trade Association, 273 U.S. 52, 63, 47 S.Ct. 255, 258, 71 L.Ed. 534 (1927); Carter Products, Inc. v. Federal Trade Commission, 268 F.2d 461, 491 (9 Cir.1959) cert. denied 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959). The function of the appellate court "is limited to determining whether upon a review of the whole record it appears that the Commission's findings are supported by substantial evidence." [32] Bristol-My-

---

31. The vertical effects of the instant case are discussed in Bock, "Mergers and Markets, An Economic Analysis of Case Law" (National Industrial Conference Board, Inc., Studies in Business Economics, Number 69, 1960), pp. 58–59 where it is observed:

" * * * [T]he vertical aspects of an acquisition may be found to touch *both* former suppliers and former outlets of the acquiring or acquired unit (as in the Maryland and Virginia [167 F.Supp. 45 (D.D.C.1958), rev'd 362 U.S. 458 [80 S.Ct. 847, 4 L.Ed.2d 880] (1960), 167 F. Supp. 799 (D.D.C.1958), 168 F.Supp. 880 (D.D.C.1959), aff'd 362 U.S. 458 [80 S. Ct. 847, 4 L.Ed.2d 880] (1960)], Bethlehem [168 F.Supp. 576 (S.D.N.Y.1958)], and Spalding [the instant case, FTC Dkt 6478, Trade Reg.Rep. par. 27,858 (1959), Trade Reg.Rep. par. 28,694 (1960)] cases), or may proceed mainly *in one direction*, affecting primarily customers or potential customers (as in the Crown case [54 F.T.C. 769 (1958), aff'd 296 F.2d 800 (9 Cir. 1961)]) or suppliers or potential suppliers [as in the Du Pont (General Motors) case [353 U.S. 586 [77 S.Ct. 872, 1 L.Ed.2d 1057] (1957)]].

"All of the cases taken together, however, make it clear that the vertical effects of an acquisition may come under judicial scrutiny long before a market is foreclosed. In the Du Pont (General Motors) decision, for example, the court found that it was not necessary for General Motors to purchase *all* of its requirements for automotive finishes or fabrics from Du Pont in order for Clayton 7 to come into play; nor was it necessary that Du Pont's competitors be completely shut out from sales to General Motors. The same considerations hold in the Crown, Maryland and Virginia, Bethlehem Brown Shoe [179 F.Supp. 721 (E.D.Mo.1959)], and Spalding decisions." At p. 59.

32. The recent Section 7 case decided by the Ninth Circuit seems to be contra. In Crown Zellerbach Corp., v. Federal Trade Commission, 296 F.2d 800 (1961), the court notes the dual system of enforcement of Section 7 and rejects the suggestion "that because the Commission's 'specialization and expertise' are peculiarly adapted to its intended task of policy 'clarification and completion' our power to review these findings [of the

ers Co. v. Federal Trade Commission, 185 F.2d 58 (4 Cir.1950). Section 11 of the Clayton Act provides: "The findings of the commission * * * as to the facts, if supported by substantial evidence, shall be conclusive." 38 Stat. 734, as amended 73 Stat. 244, 15 U.S.C.A. § 21.

## THE TEST OF "REASONABLE PROBABILITY"

Under Section 7 of the Clayton Act the Government is not required to show that competition has been or is being restrained or that monopoly exists. The legislation was contrived as a preventive measure to eliminate the proscribed activities before they became operative. Obviously if they actually came into being generally the enforcement of the provisions of the Sherman Act (15 U.S.C.A. §§ 1–7, 15 note) would be available to subdue them and there would be no need for resort to a Clayton Act proceeding. The burden rests upon the Government only to show, in the words of Section 7, that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

■ The words "may be" are not to be construed lightly. Important business policies and valuable properties of great concern to the companies involved rest in the balance in litigation such as this. The connotation to be given the words "may be" is clearly stated in United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 607, 77 S.Ct. 872, 884, 1 L.Ed.2d 1057 (1957) as follows: "* * * the test of a violation of § 7 is whether, at the time of suit, there is a reasonable probability that the acquisition is likely to result in the condemned restraints." [33] The Commission, in this case, acted within the limitations thus defined.

## THE TEST OF "QUANTITATIVE SUBSTANTIALITY"

Spalding charges that the Commission has limited its inquiry into the effects of the acquisition by Rawlings to statistics dealing with rank and percentages and that it has merely construed market shares of the acquired and acquiring companies on the basis of quantitative data. Thus, asserts Spalding, the Commission relies solely upon the "quantitative substantiality" theory to support the holding that the acquisition of Rawlings violates Section 7.

Neither the Commission nor the courts have accepted a transplantation of the doctrine of quantitative substantiality from Section 3 to Section 7,[34] which would have made for a rigid and mechanical standard, not geared to the economic realities nor designed to demonstrate whether the vigor of competition in the given industry was being reduced as contemplated by Section 7.[35]

Commission] is more limited than our power to review findings of a court," citing Matter of Pillsbury Mills, 50 F.T.C. 555, 564–565 and Davis, Administrative Law Treatise, § 29.02. In Zellerbach the court applied "the same 'clearly erroneous' test in the same manner as if the findings * * * were those of a district court." 296 F.2d at p. 815, n. 11.

33. In United States v. Bethlehem Steel Corporation, 168 F.Supp. 576, 603 (S.D. N.Y.1958), the court stated:
"* * * The Government is not required to establish with certitude that competition in fact will be substantially lessened. Its burden is met if it establishes a reasonable probability that the proposed merger will susbtantially lessen competition or tend to create a monopoly. 'A requirement of certainty and actuality

of injury to competition is incompatible with an affort to supplement the Sherman Act by reaching incipient restraints.'" (Footnotes omitted.)

34. See Bok "Section 7 of the Clayton Act and the Merging of Law and Economics," 74 Harv.L.Rev. 226, 250–251; and see Handler and Robinson "A Decade of Administration of the Celler-Kefauver Antimerger Act," 61 Colum.L.Rev. 629, 671–679 (1961).

35. In Transamerica Corporatión v. Board of Governors, 206 F.2d 163, 170 (3 Cir. 1953), cert. denied 346 U.S. 901, 74 S.Ct. 225, 98 L.Ed. 401 (1953), a case arising under Section 7 prior to the 1950 amendment, this court held:
"The situation with respect to corporate stock acquisitions, the subject matter of Section 7, is wholly different, how-

■ It is clear that the "quantitative substantiality" doctrine is not to be regarded as the sole determinative of the violative nature of an acquisition of stock or assets in Section 7 cases.[36]

In the recent case of Crown Zellerbach Corp. v. Federal Trade Commission, 296 F.2d 800 (9 Cir.1961) the court stated:

"Much has been written concerning the appropriate tests to be applied in enforcing § 7. On the one hand the comparatively simple standard based on the merged company's percentage of the market has been suggested,—the rationale applied in Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, where there was involved the exclusive supply contract prohibitions of § 3 of the Clayton Act, 15 U.S.C.A. § 14. Although § 3 used the same language as does § 7 in referring to the lessening of competition and the tendency to monopoly, yet persuasive reasons have been given as to why this so-called 'quantitative substantiality' test is not properly applied in a § 7 case." (Footnote omitted.) 296 F.2d at p. 826.

In this case the Commission did not rest its conclusion "on nothing more than the simple addition of the market shares of the acquired and acquiring companies," as Spalding contends. Here the Commission gave its attention, among other things, to evidence as to whether the merger between the acquired and acquiring companies resulted in a substantial increase in the concentration of power in the absorbing concern in what it had determined were the relevant lines of commerce, i. e., athletic products in the higher priced categories and the athletic goods industry.

It further examined the testimony and concluded that smaller firms did not grow in the industry; that it was difficult for them to survive and that no firm had risen to the status held by Rawlings from the time of the organization of Wilson in 1910 until the merger. It considered the various competitive factors involved in the manufacture and distribution of higher quality baseballs, footballs and softballs and concluded that the acquisition would place Spalding in a position of leadership in an oligopolistic industry—in which insuperable barriers would be raised to competition from new or existing firms.

The Commission carried on its inquiry in the spirit of the amended Section 7 and the legislative intent of Congress, manifest in the Senate and House Reports.[37]

ever. For the acquisition of the stock of two or more corporations engaged in interstate commerce is not per se a violation of the section. On the contrary such acquisition is a violation only if its effect may be in fact to substantially lessen competition between such corporations, to restrain commerce or to tend to create a monopoly. Otherwise the acquisition is entirely lawful, so far as Section 7 is concerned. It necessarily follows that under Section 7, contrary to the rule under Section 3, the lessening of competition and the tendency to monopoly must appear from the circumstances of the particular case and be found as facts before the sanctions of the statute may be invoked. Evidence of mere size and participation in a substantial share of the line of business involved, the 'quantitative substantiality' theory relied on by the Board is not enough." (Footnote omitted.)

36. Soon after the adoption of the 1950 amendment, in the Matter of Pillsbury Mills, 50 F.T.C. 555, 564 (1953), the Commission held:

"Much as the simplified test laid down in Standard Stations [337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949)] and International Salt [332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947)] may aid in the presentation of proof in cases under Section 3, it is not in itself a reliable guide for the Commission in carrying out its long-run responsibility to prevent reductions in competition through acquisitions of assets or stock."

See Brillo Manufacturing Co., Inc., CCH Trade Reg.Rep. § 27,243, supra (1958) and CCH Trade Reg.Rep. § 28,667 (1960).

37. S.Rep. 1775, 81st Cong., 2d Sess. (1950), U.S.Code Cong.Service, 1950, p. 4293. H.R.Rep. 1191, 81st Cong., 1st Sess. (1949).

Much has been written of the historical background of the Clayton Act and the 1950 amendment to Section 7.[38] Suffice it here to repeat that the Clayton Act was passed in 1914 to check anti-competitive acts in their incipiency, i. e., before they reached Sherman Act proportions. It proved to have severe limitations which became obvious in a period of increased merger activity.

The 1950 amendment affected Section 7 by prohibiting the acquisitions of assets as well as stock; by eliminating the substantial lessening of competition between acquiring and acquired companies as an essential test of violation and by substituting "in any line of commerce in any section of the country" for "in any section or community."

The House Report on the 1950 amendment to Section 7 noted that "the level of economic concentration in American industry is high"; that "the long term trend of concentration has been steadily upward"; and that "[t]his long term rise in concentration is due in considerable part to the external expansion of business through mergers, acquisition, and consolidations." H.R.Rep.No.1191, 81st Cong., 1st Sess., p. 2 (1949). The Report further stated:

"Acquisitions of stock or assets have a cumulative effect, and control of the market sufficient to constitute a violation of the Sherman Act may be achieved not in a single acquisition but as the result of a series of acquisitions. The bill is intended to permit intervention in such a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition,

even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize. Such an effect may arise in various ways; such as elimination in whole or in material part of the competitive activity of an enterprise which has been a substantial factor in competition, increase in the relative size of the enterprise making the acquisition to such a point that its advantage over its competitors threatens to be decisive, undue reduction in the number of competing enterprises, or establishment of relationships between buyers and sellers which deprive their rivals of a fair opportunity to compete." p. 8

The statement in the Report is illuminating and affords a guide to the intent of Congress as to considerations to be made for the purpose of determining whether the Act has been violated.[39] While in this case the Commission makes no specific reference to the quoted passage from the Report it was unquestionably influenced by its statement as to the various ways in which the effect of an acquisition may be a significant reduction in the vigor of competition. Yet it comes to its final conclusion not only from these but from other considerations as well.

FORBIDDEN EFFECT IN ANY RELEVANT LINE OF COMMERCE VIOLATES SECTION 7

 ██ A merger violates Section 7 of the Clayton Act if the forbidden effect occurs in any line of commerce, and it need not involve a large part of the business of the merging corporations.[40] In

---

38. See H.R.Rep. No. 1191, 81st Cong., 1st Sess., pp. 3–5 (1949); United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958); Handler and Robinson "A Decade of Administration of the Celler-Kefauver Anti-Merger Act," 61 Colum.L.Rev. 629, 652–675 (1961).

39. But see critical comments in Handler "Annual Review of (1960) Antitrust Developments", 15 Record of N.Y.C.B.A. 362, 378, et seq. and Handler and Robinson, supra, at pp. 669–671.

40. In United States v. Bethlehem Steel Corporation, 168 F.Supp. 576, 595 (S.D. N.Y.1958), the court said:
"It is not necessary to analyze separately and in detail each line of commerce as found by the Court, since a merger violates section 7 if the proscribed effect occurs in any line of commerce 'whether or not that line of commerce is a large part of the business of any of the corporations involved' 39 or 'where the specified effect may appear on [an] * * * in-

this case the Commission properly held that the effects of the merger were violative of Section 7 in a number of relevant lines of commerce involving substantial segments of the businesses of Spalding and Rawlings.

### SUMMARY AND CONCLUSION

To recapitulate there was substantial evidence before the Commission susceptible of the inferences validly drawn by it to justify it in finding that Spalding and Rawlings were engaged primarily in the production of athletic goods in the higher priced higher quality categories, particularly with regard to baseballs, basketballs, footballs and softballs, constituting a separate and distinct line of commerce upon which the merger was to be measured. It similarly had before it substantial evidence from which to conclude that the athletic goods industry as a whole, as reported by AGMA, constituted a line of commerce within the meaning of Section 7 of the Clayton Act. We so conclude from the entire record before the Commission and the law as we have heretofore construed it.

There was likewise substantial evidence from which the Commission found that prior to the acquisition the relevant lines of commerce were dominated by four general line firms, Wilson, Spalding, MacGregor and Rawlings which, based on AGMA statistics, accounted for approximately 50 percent of the total industry production and sales in 1954 and 46.4 percent in 1955; that the next 15 firms accounted for 34.7 percent of total production and the remaining 56 companies accounted for 18.9 percent of the total; that by reason of the acquisition Spalding, the second largest with 12.5 percent when combined with Rawlings, the fourth with 6 percent, became the leader of the industry; that nearly 50 percent of the total industry was then concentrated in three firms, Spalding, Wilson and MacGregor; that thereafter Spalding's sales were more than four times that of the fifth ranking firm and five times more than that of the sixth ranking firm.

But evidence also disclosed that the primary concern of the four general line companies was the production and sale of higher priced higher quality athletic goods; that in 1955 in the higher priced higher quality line of baseballs the four companies produced 80 percent of the quantity and 83.4 percent of the sales; that Spalding's share was 24.5 percent of the quantity and 26.5 percent of the value, and Rawlings's was 15.3 percent of the quantity and 13.9 percent of the value; that by reason of the merger Spalding became the leader with a percentage of 39.3 percent of the quantity and 40.4 percent of the total value, followed by Wilson with 26 percent of quantity and 29 percent of value and MacGregor with 15.4 percent of quantity and 16.1 percent of value. It was also shown that Spalding acquired similar leadership in other higher priced higher quality categories.

In giving consideration to Spalding's status and to the various competitive factors involved, the Commission was justified in concluding that "it appears extremely doubtful that Spalding's leadership in this line of commerce will be seriously challenged in the foreseeable

dustry-wide scale. The purpose of [section 7] is to protect competition in each line of commerce in each section of the country.' " [40]

"[39] S.Rep. No. 1775 p. 5.

"[40] H.R.Rep. No. 1191 p. 8."

To like effect is Crown Zellerbach Corp. v. Federal Trade Commission, 296 F.2d 800 (9 Cir. 1961) where it was said: " * * * All that the Commission was required to do was to ascertain and find a product line which was sufficiently inclusive to be meaningful in terms of trade realities. If it were otherwise, it would be a practical impossibility to ap-

ply the prohibitions of § 7 in the case of an absorbed concern which produced a multitudinous number of inconsequential and minor products. In the statutory phrase 'in any line of commerce', the word entitled to emphasis is 'any'. *Any* line of commerce does not mean the same as the entire line of commerce, or all lines of commerce engaged in or touched upon by the acquired concern. The line of commerce need not even be a large part of the business of any of the corporations involved." (Footnote omitted.) 296 F.2d at pp. 811–812.

future or that any change can be anticipated in the oligopolistic situation existing in the market." [41]

It was further shown that prior to the merger Rawlings was experiencing rapid growth and expansion; that from 1953 to 1955 its total assets increased by 22 percent and its net worth increased by 25 percent; that it had nation-wide distribution facilities, a well-known trade name, and financial resources to engage in active national advertising and research development; that it had exclusive adoption contracts with professional leagues and teams and endorsement contracts with star athletes; that Rawlings sold 29 of the major products in the athletic goods industry in competition with Spalding, 18 of which it manufactured; that along with Spalding, Wilson and MacGregor it was competent to compete on a general line basis.

It was further shown that of the small single line companies many were engaged in the manufacture and sale of goods in the low quality lines while none manufactured substantial quantities of the higher priced lines. They were not significant competitors in the field in which Spalding and the other general line companies predominated.

The Commission was justified in finding that the elimination of Rawlings left Wilson and MacGregor as the only firms with the capacity to compete on equal terms with Spalding in the higher priced higher quality area of production and that the concentration of the industry in that category was markedly intensified by the absorption of Rawlings.

Finally, although less clearly apparent than the aspects of horizontal merger the Commission was justified in holding that the acquisition of Rawlings by Spalding also had vertical implications and that it was reasonably probable that Spalding will foreclose manufacturers from their outlet of products to Rawlings of which Spalding was a competing manufacturer. The Commission was likewise justified in holding that there was a reasonable probability that manufacturers who competed with Rawlings will also be foreclosed from their outlet of products formerly sold to Spalding.

An examination of the entire record before the Commission persuades us that there was substantial evidence, from which together with the reasonable inferences to be drawn therefrom, the Commission was justified in holding that the effect of the acquisition by Spalding of Rawlings "may be substantially to lessen competition or to tend to create a monopoly" in each of the relevant lines of commerce designated by the Commission and that Section 7 of the Clayton Act as amended was violated by the merger.

The order of the Commission will be affirmed and enforced.

KALODNER, Circuit Judge (concurring in part and dissenting in part).

I do not subscribe to the majority's view that the Federal Trade Commission properly classified the "athletic goods industry" as a "relevant line of commerce." The Commission used too broad a brush and to wide a sweep in doing so. The product lines included by the Commission in the "athletic goods industry" range from baseballs, basketballs, footballs, golf balls, soccer balls, softballs, tennis balls, volley balls and badminton shuttlecocks to such diverse items as shoes, hip, kidney and shoulder pads, leg guards, golf clubs, football helmets, boxing gloves, masks, tennis racket frames, etc., etc. Numerous of the items mentioned have little in common in terms of physical characteristics, raw materials, manufacturing processes, end uses, pricing or consumers.

Neither the Commission, nor the majority, has demonstrated, for example, how or why golf bags can be related to baseballs as a "relevant line of commerce."

---

41. The characterization "oligopolistic" as used by the Commission is warranted in the category of higher priced baseballs where prior to the merger four firms produced 80 percent of the quantity at prices practically parallel as reported to AGMA and in their respective price lists.

There is just as much—or as little—affinity or community of relevance between the business of horse racing and automobile racing as there is between baseballs and golf bags. One cannot imagine classification of horse racing and automobile racing as a "relevant line of commerce."

I concur, however, with the holding of my brethren that "there was substantial evidence before the Commission susceptible of the inferences validly drawn by it to justify it in finding that Spalding and Rawlings were engaged primarily in the production of athletic goods in the higher priced, higher quality categories, particularly with regard to baseballs, basketballs, footballs and softballs, constituting a separate and distinct line of commerce upon which the merger was to be measured." On this score the record justifies the holding of the Commission that the effect of the acquisition by Spalding of Rawlings "may be substantially to lessen competition, or to tend to create a monopoly" in violation of Section 7 of the Clayton Act.